[Civ. No. 19743. Third Dist. Sept. 2, 1981.]

RAYMOND W. PISTORIUS, Plaintiff and Respondent, v.
PRUDENTIAL INSURANCE COMPANY OF AMERICA,
Defendant and Appellant.

542

COUNSEL

Richard J. Kilmartin, John P. Lynch, Stanton G. Ware and Richard F. Dole and Knight, Boland & Riordan for Defendant and Appellant.

Shernoff, Wild, Lipsky & Batchelor, William M. Shernoff, Leonard Sacks and Lee Mandell for Plaintiff and Respondent.

## OPINION

REGAN, J.—Plaintiff brought this action upon a disability insurance policy for (a) declaratory relief to determine disability; (b) bad faith breach of the covenant of good faith and fair dealing; (c) unpaid disability benefits under the policy; (d) general damages; (e) punitive damages; and (f) attorney's fees. The case was tried to a jury which brought in a special verdict that defendant handled plaintiff's claim in an "unreasonable" manner and in "bad faith," as a result of which plaintiff sustained compensatory damages in the amount of $45,000; and punitive damages were assessed against defendant in the sum of $1 million.[1] From the judgment entered upon the verdict, defendant appeals, contending there were errors in instructions, that the compensatory damages were grossly excessive and the award of punitive damages should be reversed or drastically reduced.[2] Ultimately, defendant asks us to reverse the judgment and order a new trial.

### Facts[3]

Plaintiff purchased the disability insurance policy from an agent of defendant (a Mr. Gadras) in 1970. Plaintiff was 33 years of age, married, with 4 children. He had been a truck driver since he left military service in 1958 and had received no formal education after the ninth grade.

---

[1]On defendant's cross-complaint for declaratory relief to recover from plaintiff such disability benefits as had been paid to him, the jury found for plaintiff. There is no appeal from the judgment on the cross-complaint.

[2]In conjunction with its appeal from the judgment, defendant appeals from the order denying its motion for judgment notwithstanding the verdict and the order denying its motion for a new trial. The former is an appealable order and the latter is reviewable on appeal from the judgment. (Code Civ. Proc., § 904.1, subd. (d); *Wilkinson v. Southern Pacific Co.* (1964) 224 Cal.App.2d 478, 483 [36 Cal.Rptr. 689].)

[3]We have summarized the facts, viewing the evidence, as we must, in the light most favorable to respondent and giving all inferences to respondent. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]; *Fallert v. Hamilton* (1952) 109 Cal.App.2d 399, 404 [240 P.2d 1007].)

The policy provided for disability payments of $300 per month after a four-week waiting period. The maximum duration was 15 years. For the first 24 months, disability payments were required if the insured was unable to perform "any and every duty pertaining to his occupation . . . ." After 24 months, payments were required if the insured was unable to engage in "any and every gainful occupation for which he is reasonably fitted by education, training or experience."

Plaintiff sustained injuries on December 2, 1970, and again on November 19, 1971. As a result of these two incidents, plaintiff was unable to work, and defendant paid him disability payments under the policy from December 1970 until July 1973.

On July 18, 1973, Steve McKeown, one of defendant's claims examiners, sent an interoffice memorandum to a "Miss Harris," in which he noted that plaintiff had passed the 24-month period for disability in the insured's occupation. McKeown suggested that a "complete work up" be done on the case and that plaintiff's attending physicians be interviewed. The response to this memo two days later noted agreement with this recommendation.

Despite these recommendations no workup or investigation was done and according to Burdell Benson, defendant's claim consultant, "[t]he decision was made" to terminate plaintiff's benefits "[w]ithout seeking any information." On July 24, 1973, less than a week after the recommendations of McKeown and Harris were made, defendant wrote plaintiff terminating his payments. Thereupon, plaintiff called his insurance agent (Gadras). Gadras advised plaintiff to write to defendant and advised that he would also contact defendant.

On August 1, 1973, pursuant to Gadras' suggestion, plaintiff wrote defendant a letter protesting the termination of payments. In this letter plaintiff advised defendant that he was still totally disabled and that his condition had not improved sufficiently to make him able to find a job. Gadras also protested to the claims department, stating that he agreed with plaintiff that the disability benefits should not have been discontinued.

On September 10, 1973, defendant selected an investigator to conduct a full-scale and searching investigation. That investigation included a review of the reports of the various physicians who had treated plaintiff and a review of the workers' compensation proceedings. It

also included interviews with plaintiff's neighbors, and an unannounced call on plaintiff.

Defendant's investigator completed the investigation in three days. On or about October 12, 1973, about three months after termination, defendant resumed payments. The decision to restore the payments was made by an "M. R. Zebbin" (phonetic). Defendant did not produce any documents that reflected the reason for this decision, or the reason for the delay in issuing payments, although defendant's claim consultant (Burdell Benson) testified he would "assume [Zebbin] reviewed the file."

The "file," in fact, according to testimony of Benson, consisted of interviews with neighbors, records of Doctors Prisanzano, Strauch and Cox, and records of the workers' compensation claim. The payments which were resumed to plaintiff were based on full disability for *any* occupation. Benson also testified that had plaintiff not complained of cessation of payments at the two-year period, no investigation would have been made to determine if plaintiff was entitled to a continuance under the unfitness for *any* occupation clause.

Defendant conceded that subsequent to its termination and resumption of payments in 1973, and from 1974 through 1977, it received medical certifications that plaintiff was totally disabled and was satisfied he was.

On March 2, 1978, one of defendant's claims examiners, Fred Totten telephoned Roger Howe, plaintiff's attending physician, and was advised by Dr. Howe that plaintiff was disabled, that his disability was continuing, and that although he could in the future be rehabilitated into a sedentary occupation, he was totally disabled as of that time. This information is reflected in an interoffice memorandum from Totten dated March 2, 1978. Defendant's claims consultant (Benson) and its claims examiner (Totten) conceded that this report reflected that plaintiff's condition had remained unchanged over the past four years. Benson stated that being able to perform in sedentary occupations with training would not make him ineligible for benefits.[4]

---

[4]Defendant, through Benson and Totten, conceded that, under the terms of the policy, an insured was totally disabled unless he was able to work at a gainful occupation for which he was qualified by education, training or experience. Defendant further conceded that an insured is not required under the policy to make any attempts to retrain himself for an occupation which he would be physically able to pursue. The fact that

On March 8, 1978, without requesting or requiring plaintiff to be further examined by doctors of its own choice, defendant terminated further payments. Prior to written notice of termination, Totten telephoned plaintiff and advised him that defendant felt he was no longer disabled and it was going to terminate his payments. Plaintiff advised Totten that he was still disabled and that he would protest any termination to the "state insurance board." Totten then became "curt" and "sarcastic." He threatened that if plaintiff complained to the "state board of insurance adjusters board" defendant would seek recovery of the sums it had previously paid to plaintiff.

Plaintiff also urged Totten to select a doctor of defendant's choice to examine him, and if the doctor agreed with defendant then he would acquiesce in the termination. Totten refused, stating that defendant wasn't required to do that.

On March 10, 1978, plaintiff wrote a letter to Totten, outlining his position, and enclosed a copy of his complaint to the Department of Insurance, which had been sent on or about the same time. On April 7, 1978, defendant responded to an inquiry from the Department of Insurance. In the written response, defendant represented, inter alia, to the Department of Insurance that the payments were "initially terminated based upon the attending physician's finding that Mr. Pistorius was not totally disabled ...." Defendant also represented to the Department of Insurance that plaintiff "admitted that he had voluntarily quit the rehabilitation course leading to proficiency in the repair of small engines."[5]

The Department of Insurance reviewed defendant's file on the case and requested defendant to order an independent medical examination of plaintiff, and to furnish the department with a copy of his report. On April 28, 1978, defendant retained Equifax Services, its agent for this purpose, to set up an examination with a board certified orthopedist. Defendant inserted into the request to Equifax the following: "We are referring Mr. Pistorius for an independent medical examination to de-

---

an insured might, through retraining, potentially be capable of performing some occupation in the future was conceded to be immaterial.

[5]The representations were not accurate. Defendant admitted at trial, as indicated hereinabove, that no findings of any physician were the basis for termination of payments. Plaintiff never took any courses in small engine repair because none such were available. He had been given courses in auto mechanics by the State Department of Rehabilitation but could not perform that occupation because of his back problems.

termine if he is totally disabled, unable to perform every occupation for which he is reasonably fitted by education, training or experience. It should be noted that Mr. Pistorius' physician has not certified to his disability. And Mr. Pistorius has been retrained in the repair of small engines and motors."

By letter dated May 9, 1978, Equifax Services relayed the foregoing information to a physician of its selection, Dr. Justin Howland of Redding.

At trial, Totten conceded that the report of Dr. Howe (plaintiff's physician) reflected that plaintiff was totally disabled within the meaning of the policy. He claimed that his statements in the letter to Equifax were "accurate within my understanding of what Dr. Howe said." However, he admitted that his statements were "misleading."

On May 26, 1978, Dr. Howland examined plaintiff. He rendered his report the same day. The conclusion of his three-page report was as follows: "As to disability, at this time because of this painful lesion [a herniated disc] I would say that since this man is trained for auto mechanics, I would feel he could not do anything dealing in auto mechanics. He is trained by experience to be a truck driver, but I would not feel he is satisfactory for truck driving. He is apparently wanting to be a bus driver and indeed he could be a bus driver for 2-3 hours a day however this would imply that he would do nothing more than simply do the mechanics of driving and would not be available for any emergencies or changing of bus tires, or such things which may or may not come up during the course of driving a bus."

Defendant inquired of Dr. Howland by phone on July 6, 1978, if plaintiff was able to do some kind of mechanical work. Dr. Howland advised defendant that the "insured could not perform duties of *any* type of mechanic." (Italics added.) On the same day, Jane Garrett, one of defendant's claims examiners addressed a memorandum to Benson, as follows:

"IME doctor states insured cannot perform duties of any mechanic job. Even if insured did spend 5 yrs. in rehab training, if he could not physically perform duties of occupation, it seems we have little alternative but to continue benefits.

"Please advise."

Defendant through Benson, continued to take the position that plaintiff could function as a bus driver. Benson also suggested that as an additional ground for denying payments, defendant should claim that plaintiff violated the technical policy requirement that the policyholder be "under [t]he regular care of a physician."

"Therefore," Benson's memorandum concluded, "I would still like to deny benefits." This was agreed upon by another company officer.

Following instructions from her superiors, on July 13, 1978, Garrett wrote plaintiff and advised him that defendant would continue to withhold payments. That letter states, in part, as follows: "It is the opinion of the physician who performed an independent medical examination on May 26, 1978, ... that you could perform occupational duties for which your [*sic*] have training and/or experience."

After receiving defendant's letter of July 13, 1978, plaintiff contacted Dr. Howland and ascertained that defendant's letter had inaccurately reported Dr. Howland's opinion. Plaintiff then wrote defendant on July 18, 1978, so advised defendant and also advised that unless he heard from defendant within 10 days, he would instruct his attorneys to proceed to file a lawsuit.

On August 4, 1978, defendant wrote Dr. Howland, professing to seek "further clarification" of his opinion. On August 8, 1978, Dr. Howland again advised defendant that plaintiff could not drive a bus as a steady job, was not qualified by reason of education or experience to engage in any occupation, and was totally disabled.

On August 10, 1978, Lee Mandell, plaintiff's attorney, wrote defendant, advising that he had been retained by plaintiff, and that a suit had been filed and would be served shortly.

On August 14, 1978, four days after Mandell's letter, Garrett again recommended to Benson that payments be resumed. Benson responded that in view of Dr. Howland's letter, "we have no choice but to continue payments."

On August 24, 1978, Garrett wrote to Mandell, stating that defendant had received additional information concerning plaintiff's condition and this supported his claim for disability benefits. A check in the amount of $1,540 for the back payments was paid to plaintiff shortly

thereafter, one-third of which went to his attorney and shortly thereafter the rest to pay accumulated debts.

Defendant repeatedly testified its handling of the claim was proper and in accordance with its standard operating procedures, it handled this claim fairly, it handled all its claims in the same fashion as it handled this one, and it would handle plaintiff's claim the same way if it had to do it all over again.

## Discussion

Defendant concedes that the evidence in this case was sufficient to support the jury's finding in its special verdict that defendant "had breached the implied convenant of good faith and fair dealing" and that plaintiff sustained damages. The issues which defendant raises have to do with the nature and amount of these damages, both compensatory and punitive. The compensatory award was $45,000 by special verdict "to compensate plaintiff for future benefits under the policy, damages for mental and emotional distress, and damages for other economic losses." The $1 million punitive damages were based on the jury's finding of "bad faith."

■ Defendant contends the compensatory damage award cannot stand because it contained as an element $17,200 representing the present cash value of future policy benefits and an amount of $27,350 for emotional distress.[6] In this connection the trial court gave, inter alia, the following instructions:

"If you find that the defendant breached its covenant of good faith and fair dealing owed the plaintiff in this case, you may award compensatory damages to the plaintiff for the following items:

"First, the present cash value of all future benefits that you conclude the plaintiff will be entitled to receive.

"Second, all mental and emotional distress proximately caused by defendant's breach of his covenant of good faith and fair dealing.

---

[6]The record shows the "present cash value of future policy benefits" was calculated at $17,200, the amount paid out for attorney's fees at $450, and the amount asked for emotional distress was "between $10,000 and $50,000. Defendant points out that it "reasonably follows" the jury awarded $27,350 for emotional distress. We shall accept this postulate for purposes of considering the contentions.

"And third, all economic loss proximately caused by defendant's breach of its duty of good faith and fair dealings.

"If you find that the defendant breached its duty of good faith and fair dealings owed to the plaintiff, then you may include in the compensatory damages awarded all future policy benefits which you conclude, after examination of the policy and other evidence, plaintiff would have been entitled to recover in the future had the defendant honored the insurance policy."

Defendant contends the trial court erred in giving the portions of the above instructions relating to the present cash value of all future benefits as compensatory damages.

Defendant's position that compensatory damages based on a contractual cause of action for breach of an implied covenant of good faith in a disability insurance policy cannot include a sum for future benefits is correct. (*Erreca* v. *West. States Life Ins. Co.* (1942) 19 Cal.2d 388, 402 [121 P.2d 689, 141 A.L.R. 68].) However, where the damages are based on a *tort* theory, the situation is different. As stated by the Supreme Court in *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 824, footnote 7 [169 Cal.Rptr. 691, 620 P.2d 141]: "We have never held, however, that future policy benefits may not be recovered in a valid tort cause of action for breach of the implied covenant of good faith and fair dealing, nor does defendant offer any compelling reason for extending *Erreca* to such actions. Thus, in applying to these facts the general rule for fixing tort damages (Civ. Code, § 3333), the jury may include in the compensatory damage award future policy benefits that they reasonably conclude, after examination of the policy's provisions and other evidence, the policy holder would have been entitled to receive had the contract been honored by the insurer."

In this case, the trial court instructed the jury specifically based on the *Egan* ruling on compensatory damages for future policy benefits, and the jury rendered a special verdict based on the theory that the manner in which defendant handled plaintiff's claim "was unreasonable and in bad faith," and that plaintiff sustained damages "as a proximate result of defendant's bad faith." This theory of liability was plainly a tort theory in conformity with the instruction, and the verdict is supported by substantial evidence in the record.[7]

[7]Testimony of defendant's own medical expert, Dr. Howland, was enough to support a conclusion that plaintiff was totally disabled within the meaning of the policy as of

■ Defendant contends the evidence does not support the award of damages for emotional distress—i.e., that they were "grossly excessive." We disagree.

Taking plaintiff's figures as to the "break-down" of the undifferentiated compensatory damages verdict as reasonably accurate, arguendo, there was approximately $27,350 awarded for emotional distress (see fn. 6, *ante*). This is the sum attacked by defendant.

There is no doubt concerning the existence of substantial evidence of emotional distress, consisting of anger, anxiety, humiliation and frustration, due to actions of defendant.

Defendant's arguments deprecating the evidence of emotional distress of the type described consist of reference to such evidence as that (a) defendant restored payments after a lapse over five months; (b) plaintiff had some other source of income and was able to purchase an automobile. These evidentiary matters go to credibility and weight of evidence which are matters for the jury—not for us to reweigh on appeal. (See *Jarchow v. Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 948 [122 Cal.Rptr. 470].)

Only where ""... the recovery [for emotional distress] is so grossly disproportionate as to raise a presumption that it is the result of passion and prejudice [is the duty] then imposed upon the reviewing court to act.""" (*Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 17 [130 Cal.Rptr. 416]; see also *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) This is not such a case in our view of the record. In fact, defendant has not been able to point to anything specific in the record calculated to raise passion and prejudice. Defendant instead relies upon statements in his brief that the award "cannot be reconciled with rhyme or reason" and it is "so grossly disproportionate to any distress conceivably experienced by [plaintiff] that the trial court should have rectified the matter." This case is more closely analogous to the numerous cases in which appellate courts have affirmed substantial awards of damages for emotional distress due to activities of insurance carriers. (See, e.g., *Silberg v.*

---

the date of trial and that such disability was permanent. We could have, but have not, disposed of defendant's contention on the basis that defendant participated in the drafting of the instruction, and in doing so conceded that future benefits might be awarded, but insisted that such an award be limited to "present value of all future policy benefits"—which was done.

*California Life Ins. Co.* (1974) 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103] (reinstating an award of $75,000 compensatory damages, most of which apparently constituted emotional distress damages, arising out of defendant's bad faith breach of a health care insurance policy); *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451 [136 Cal.Rptr. 653] (affirming an award of $172,000 for emotional distress damages arising out of defendant's bad faith refusal to make disability insurance payments); *Jarchow* v. *Transamerica Title Ins. Co., supra*, 48 Cal.App.3d 917 (affirming an award totalling $200,000 emotional distress damages [$50,000 to each of four plaintiffs] by reason of the defendant insurance company's action in forcing plaintiffs to bring suit and endure the trauma and financial hardship of litigation); *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] (affirming an award of $60,000 compensatory damages by reason of defendant's intentional infliction of emotional distress and bad faith in refusing to make payments under its disability insurance policy).)

■ Finally, defendant contends punitive damages were "not warranted" in this case. In support of this contention, defendant argues (a) the "whole record" does not support any award of punitive damages; (b) the trial court erred in its instructions on punitive damages; and (c) the trial court erred in admitting evidence that policy benefits had been temporarily terminated in 1973.

Two leading cases sum up the test we must apply, first as to the *right* to punitive damages and second as to the quantum. *Silberg* v. *California Life Ins. Co., supra*, 11 Cal.3d at page 462, establishes the basis of the right to punitive damages, as follows: "In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ. Code, § 3294.) He must act with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights." We are convinced from whole record, and in particular from the facts we have summarized, that defendant acted at the very least with a conscious disregard of plaintiff's rights.

■ As to the quantum of punitive damages, *Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d at page 928, after pointing out that the purpose of punitive damages is to punish wrongdoers and deter the commission of wrongful acts, laid down the following standards: "In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and

function of punitive damages. [Fn. omitted.] One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. [Citations omitted.] Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. [Citation omitted.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence ... will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations omitted.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceed the level necessary to properly punish and deter."

We have applied these standards to the facts of this case (as heretofore set out), keeping in mind the additional precept that the jury's verdict on this point is to be awarded such great weight that we may not tamper with it unless we can say, as a matter of law, that the jury acted from passion or prejudice. (See *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 927-928.)

We have not heretofore set out the facts relating to the wealth of defendant, which constitutes one of the major "yardsticks" by which we are bidden to review an award of punitive damages. As indicated above, defendant's wealth was a proper matter for the jury to consider. In *Neal, supra,* the Supreme Court reaffirmed the principle that the "function of deterrence ... will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." (*Id.,* at p. 928.) And in *Bertero, supra,* the court said that "the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective." (13 Cal.3d at p. 65.) The court concluded that the "vast wealths" of the defendants warranted a large award. (*Ibid.*)

For the year 1978, defendant's net income after taxes and dividends was $270 million. Its gross assets were in excess of $50 billion and its net worth was $2 billion. The award of $1 million was thus .00002 per-

cent of its gross assets. And it was approximately 1/20 of 1 percent of its net worth.

In *Neal* the court approved a total award of $750,000. This award amounted to defendant's net income for approximately one week, and was 1/10 of 1 percent of defendant's gross assets. (21 Cal.3d at p. 929.) The *actual* damages were $10,000.

Moreover, in *Neal*, a problem existed that the jury might have been swayed by certain conduct of counsel which constituted improper argument and appeal to passion, prejudice and sympathy. (*Id.*, at pp. 924-927.) We do not find this to be true in this case.

Cases which have found excessive punitive damages in connection with bad faith insurance transactions have most frequently found a determinative element to be that the awards amount to a disproportionate percentage of the defendant's income or its net worth. (See, e.g., *Egan v. Mutual of Omaha Ins. Co., supra*, 24 Cal.3d at p. 824—$5 million punitive excessive since it represented 2 1/2 months of defendant's net income for year 1973 and 7 months for 1974; *Merlo v. Standard Life & Acc. Ins. Co., supra*, 59 Cal.3d at p. 18—award of $500,000 was almost 1/3 of defendant's total net worth; *Little v. Stuyvesant Life Ins. Co., supra*, 67 Cal.App.3d at pp. 469-470—$2.5 million punitive damages was 15 percent of defendant's net worth; cf. *Wetherbee v. United Insurance Co. of America* (1968) 265 Cal.App.2d 921, 933 [71 Cal. Rptr. 764]—punitive damages of $500,000 held excessive because 500 times greater than the compensatory award of $1,050, but when on retrial an award amounting to 200 to 1 was awarded, it was held not excessive where it amounted to 1 week's earnings of defendant. (*Wetherbee v. United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-272 [95 Cal.Rptr. 678].)

Under the above authorities, and especially in view of the general rules of the *Silberg* and *Neal* cases, *supra*, we cannot say on this record that the amount of the punitive damages awarded was excessive as a matter of law.

■ We find no merit in defendant's contention that the court's instructions on punitive damages were erroneous. The court gave standard punitive damage instructions, among which appeared the word "fraud." Defendant claims this was error since plaintiff did not prove a case of fraud. The word appeared in the phrase "oppression, fraud or

actual malice," each word of which was defined in the instruction. Fraud was defined as "an act of trickery or deceit, intentional misrepresentation, concealment or nondisclosure . . . ." While it is probable that the jury was more impressed by definitions of "malice" and "oppression" (i.e., "willingness to vex, harass, annoy or injure" and "subjecting a person to cruel and unjust hardship in conscious disregard of his rights"), we are of the view that fraud, in addition to being part of standard punitive damages instructions (BAJI No. 14.71 (1977 rev.)), was expressly pertinent to the facts developed in this case.[8] Among those facts were: (a) defendant wrote plaintiff on July 13, 1978, and advised him falsely that Dr. Howland had concluded he was not totally disabled and (b) defendant gave false information to Equifax Services, its agent to procure a physician, that plaintiff's own physician had not certified to his disability and that defendant had been retrained in the repair of small engines and motors.

Moreover, it is clear from the cases that where, as here, a cause of action in tort for bad faith is proven, it is proper to instruct that punitive damages may be recovered by reason of defendant's fraud or malice or oppression, without establishing (as defendant here insists) that the underlying cause of action was fraud.[9] (See *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 404-405 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]; *Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 758 [161 Cal.Rptr. 322].)

■ Defendant's contention the trial court erred prejudicially in admitting evidence that policy benefits had been temporarily terminated in 1973 is likewise meritless.

Defendant relies on Evidence Code section 1101, subdivision (a), which provides that evidence of instances of a person's conduct on other occasions is inadmissible when offered to prove his conduct on a specified occasion. However, Evidence Code section 1101, subdivision (b), clearly states that subdivision (a) is inapplicable to the admission of evi-

---

[8]Civil Code section 3294 provides for recovery of exemplary damages for *either* or all of the three defined delicts—oppression, fraud or malice.

[9]We note that defendant itself offered an instruction including the phrase "oppression, fraud or malice" in connection with the right to punitive damages. We could, but we do not, hold this estops defendant from raising the issue on appeal. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 243, p. 3057; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 266, 267, pp. 4257-4258.)

dence that a person committed a crime, civil wrong, or other act when relevant to prove some fact such as motive, opportunity, intent, plan, knowledge, identity or absence of mistake or accident.

Defendant claimed throughout that it had no intention to commit any wrong. Evidence of the 1973 transaction in light of certain testimony of defense witnesses was thus relevant to meet that claim, and to confirm that it was defendant's practice to cut off disability payments to see if a policy holder would complain, and in the absence of any complaint it would not thereafter reinstate the payments.[10]

Moreover, one issue in this case which bore upon the bad faith of defendant was the response to an inquiry from the Department of Insurance concerning plaintiff's claim.

The written response furnished by defendant was contained in a letter, dated April 7, 1978. In that letter, defendant referred to its actions in terminating payments in July 1973 and made various statements. Included was the statement that defendant had terminated plaintiff's benefits in 1973 based upon the attending physician's finding that he was not totally disabled. This statement was apparently intended to convey to the Department of Insurance that plaintiff's physician had agreed, five years previously, with defendant's alleged conclusion that plaintiff was no longer entitled to disability payments. In view of this statement, the evidence concerning the 1973 transaction was pertinent and admissible to establish that the 1973 payments were cut off without any finding of any physician.

Defendant's motion to produce additional evidence in this court is denied.

The judgment and orders are affirmed.

Puglia, P. J., and Carr, J., concurred.

A petition for a rehearing was denied September 30, 1981, and appellant's petition for a hearing by the Supreme Court was denied November 25, 1981.

---

[10]Such testimony was elicited from Burdell Benson, one of defendant's claims consultants of five years' experience. He testified, inter alia, that the method of handling this claim was "standard operating procedure for Prudential." The same testimony was given by Charles Totten, a claims approver of seven years' experience with the company.