[No. A038644. First Dist., Div. Two. Nov. 2, 1988.]

HARRY ANDREWS, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants
and Respondents.

---

COUNSEL

Paul J. Matzger, Frances H. Yoshimura, Leland and Parachini, Steinberg, Flinn, Matzger & Melnick for Plaintiff and Appellant.

Louise H. Renne, City Attorney, Kimberly A. Reiley and G. Scott Emblidge, Deputy City Attorneys, for Defendants and Respondents.

---

OPINION

McCARTY, J.*—This is an appeal by plaintiff Harry Andrews from a judgment in favor of defendant and respondent the City and County of San Francisco (City) and one of its police officers after a jury verdict exonerating the defendants in plaintiff's action for wrongful arrest, false imprisonment, assault and battery, and other causes of action. We find that the trial

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

court erred in keeping from the jury all evidence of prior and subsequent assaultive conduct on the part of the booking officer, and will therefore reverse the judgment.

## BACKGROUND

On the evening of March 2, 1983, the Queen of England was dining at Trader Vic's, a well-known San Francisco restaurant. Due to the presence of demonstrators near the restaurant, the San Francisco police (SFPD) cordoned off several intersections in the vicinity. Plaintiff was the owner of the Andrews Hotel at 640 Post Street; the hotel's back entrance adjoins Agate Alley which runs near the restaurant. Agate was not barricaded, so plaintiff parked his car there. However, when one of Trader Vic's parking lot attendants ordered plaintiff to move his car, he reparked it in Shannon Alley. Plaintiff exited the vehicle with his friend Becky Stephens and walked up Agate alley. However, they were stopped by a police officer who told them they could not pass through. Plaintiff protested that he owned the building on Post Street and desired to enter the rear entrance. What took place from that point on was subject to sharply conflicting testimony:

According to plaintiff, he was confronted by Captain Shippy, who asked him for identification. Plaintiff showed him the keys to the entrance, whereupon Shippy said "Let him pass." Plaintiff then asked Shippy to tell his Officer to step aside so he could pass; Captain Shippy responded, "OK buddy, you blew it. Grab him." Several officers pounced on plaintiff and officer Woods handcuffed him. The handcuffs cut off plaintiff's circulation, but his repeated requests to have them loosened were ignored. Woods then pushed plaintiff into a paddy wagon; without the use of his arms, plaintiff fell headlong against the steel floor.

Plaintiff was then driven around in the paddy wagon for about an hour. One of the officers in charge was Officer Ramirez. After arriving at the police station, plaintiff was led from the paddy wagon and handed in his valuables. When he handed Ramirez his jacket, Ramirez proceeded to drop it on the floor. Ramirez then told plaintiff to take off his shoes. As plaintiff bent down to do so, Ramirez jumped on top of him and forced him to the ground. During the next one to two minutes, Ramirez slammed plaintiff's head against the concrete floor approximately 20 to 30 times.

The SFPD's version of the events was quite a bit different. Officer Woods testified that plaintiff, intoxicated and unruly, refused to obey his directive not to enter the alley. When asked for identification, plaintiff cursed, brought his hand around from his back pocket and grabbed Woods's baton. Within seconds, officers handcuffed plaintiff; he kept struggling to work free of the cuffs while cursing the officers profusely. Ramirez confirmed plain-

tiff's drunken behavior and appearance;[1] he also testified that because plaintiff refused his polite requests to enter the van voluntarily, he was pushed in. As he entered, plaintiff tripped over the second step and fell to the back of the van. At the police station, plaintiff continued to be hostile and uncooperative. At one point plaintiff's jacket, which had been taken off and placed on the counter, accidentally slipped to the ground. When plaintiff demanded that Ramirez pick up the jacket Ramirez refused, fearing the potential for an assault. This enraged plaintiff so much that he "took a swing" at Ramirez with his clenched fist. Ramirez responded by wrestling plaintiff to the ground and subduing him. Ramirez conceded that plaintiff "may have hit his head" when he fell to the ground. Finally, Ramirez placed plaintiff in an armlock and escorted him to his cell.

Plaintiff filed an action against the City and six SFPD officers for false arrest and imprisonment, assault and battery, negligence and violation of the Civil Rights Act. The case was tried to a jury. At the commencement of trial the parties stipulated that if any of the officers were found individually liable, the City would be vicariously liable. Accordingly, plaintiff dismissed his complaint as to all of the individual officers except Ramirez.

As will be set forth in more detail, *infra,* the City successfully prevented plaintiff from bringing before the jury evidence of six separate incidents of allegedly violent and abusive behavior on the part of Officer Ramirez, four of which took place prior and two subsequent to the subject incident. Before the case went to the jury, plaintiff dismissed his negligent hiring and supervision claim against the City. The jury returned with a special verdict in favor of the defendants. Plaintiff appeals from the ensuing judgment.

APPEAL

*Other Incidents of Misconduct*

Prior to trial the City brought a motion *in limine* to preclude any evidence of citizen complaints against Officer Ramirez appearing in his personnel file, which plaintiff had obtained through pretrial discovery. The six incidents are briefly summarized as follows:

*Baumgartner and Souza:*   On June 21, 1982, Messrs. Baumgartner and Souza were driving on the Central freeway in San Francisco when they were rear ended by a Datsun. When they turned to see what happened, they observed the driver, later identified as Ramirez, pointing a six-inch chrome revolver at them.

---

[1] Against the testimony of the SFPD officers regarding plaintiff's behavior at the scene was the testimony of two parking attendants who witnessed the arrest and denied that plaintiff was loud, profane or under the influence of alcohol.

*Fish:*   In December 1982, Ramirez arrested George Fish for drunkenness, despite Fish's protestation that he was not inebriated. Fish alleges he was beaten while being placed in the squad car.

*Forbes:*   Complainant Forbes was arrested on January 31, 1983, on a traffic warrant. Forbes alleged that while he was in custody at the police station Ramirez, for no apparent reason, took off his handcuffs and challenged him to fight. When Forbes did not accept the invitation, Ramirez struck him with his fists and pulled his hair. Later Ramirez came into the booking room and punched Forbes in the mouth.

*Belbin:*   On February 19, 1983, Charles Belbin was taken into custody while being arrested for drunkenness. Belbin, who admitted that he had been drinking but denied resisting arrest, claimed that Officer Ramirez used excessive force and deliberately broke his right arm while handcuffing him. Ramirez's version was that the arm broke when Belbin jerked it away while he resisted being handcuffed; Ramirez denied intentionally breaking Belbin's arm. Belbin was taken by ambulance to the hospital as a result of this injury.

Plaintiff's arrest occurred in March of 1983.

*Palladino:*   On July 27, 1983, Nicholas Palladino was arrested for drunkenness. While he was standing, handcuffed, in the booking area, Ramirez came up to him and said "So you want to hit a cop?" whereupon the officer proceeded to strike Palladino and kick him in the ribs.

*Gibbs:*   Ms. Gibbs testified that on September 3, 1983, she met Ramirez in a bar and walked him to another. Ramirez, who was off duty and highly inebriated, asked her to go dancing, but she refused. Later, she gave him a ride to his car. She asked him five or six times to get out of her car, but Ramirez refused. Finally, for no apparent reason, he cursed her and struck her in the face, cutting her mouth.[2]

The court granted the City's pretrial motion to exclude all evidence of these incidents, without prejudice to renew. The court also stated that if Ramirez or one of the defense witnesses were to "open Pandora's box," it would allow "everything" to go in.

### Ramirez's Testimony

During his direct examination, Ramirez was asked about his feelings toward plaintiff during the booking, and the following exchange took place:

---

[2] Another incident in Ramirez's personnel file revealed that he was himself arrested for drunk driving (to which he eventually pleaded no contest). According to the arrest report, Ramirez used foul and abusive language toward the arresting highway patrol officer. However, this incident was not a "complaint," did not involve the use of physical force, and was thus apparently not encompassed by the City's motion or court's ruling.

[RAMIREZ]: "Well, *I have booked a lot of prisoners and I have developed patience working with these people that have been arrested,* and I was very patient with him. [¶] Q: Okay. Were you angry or were you irritated at all at the way he was—[¶] A: Yeah, I was a little irritated, but I understood the circumstances of his arrest. I took that into account and just performed my duties at the time." (Italics added.)

On cross-examination, plaintiff's attorney developed the concept further: "Q: Now, Officer Ramirez, you also testified that you booked many people and that you have been very patient in that process; is that correct? [¶] A: I have lot of patience, yes. [¶] Q: When you said that you booked many people and you had been patient in that process, were you referring to bookings that occurred before this night and after that night? [¶] A: As a general rule I am very patient with—Q: I am referring to bookings that occurred both before this night and after this night. [¶] A: Before and after."

Armed with this testimony, plaintiff's attorney argued in chambers that Pandora's box had indeed been opened and that the complaints of violent and abusive behavior by Ramirez should be admitted to impeach him. The court was nevertheless unpersuaded and refused to change its prior ruling. Plaintiff now contends the court's refusal to admit the misconduct evidence was reversible error.

## ANALYSIS

Three primary questions are presented for review. First, were other incidents of Ramirez's misconduct admissible under the rules of evidence? Second, if they were, was it a proper exercise of discretion for the trial judge to have kept them out on grounds that their prejudicial effect exceeded their probative value under Evidence Code section 352? Third, if there was error in failing to admit this evidence, did the error result in a miscarriage of justice?

### Admissibility Under Section 1101

Under California Evidence Code section 1101, subdivision (a) (all further undesignated statutory references are to that code), evidence of a person's character, whether in the form of opinion, reputation or specific instances of misconduct is prima facie inadmissible if offered only to prove that his conduct on a specified occasion conformed to that character. (§ 1101, subd. (a); 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 33.3, p. 1179.) However, subdivision (b) of section 1101 states the exception to that rule: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some

fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts." ■ " 'Although generally the *character* of a witness may not be attacked by evidence of specific wrongful acts . . . , this rule is not controlling where the inquiry goes beyond character and involves a basic fact in issue.' " (*People* v. *Mascarenas* (1971) 21 Cal.App.3d 660, 669 [98 Cal.Rptr. 728], citing *People* v. *Clark* (1965) 63 Cal.2d 503, 505 [47 Cal.Rptr. 382, 407 P.2d 294].)

Although both sides agreed there was a physical confrontation and a struggle at the booking counter, Ramirez's version and plaintiff's version of what took place were diametrically opposite. Plaintiff claimed Ramirez deliberately threw his jacket on the floor and demanded that plaintiff pick it up. Then, while plaintiff was in a bent over position, Ramirez allegedly jumped on top of him and repeatedly bashed his head against the floor. Ramirez, on the other hand, characterized himself as the patient, polite officer, trying to subdue an inebriated, unruly and profane arrestee. According to Ramirez, the jacket fell on the floor accidentally and it was plaintiff who demanded that Ramirez pick it up. Plaintiff reacted to Ramirez's refusal to do so by taking a swing at him with his fist, forcing Ramirez to wrestle him to the ground in order to quell him.

■ Ramirez's intent was a central issue in the case. He professed that he was merely attempting to control plaintiff by use of reasonable force under the circumstances, whereas plaintiff contended that Ramirez not only provoked the confrontation, but intentionally injured him. Evidence that Ramirez had a practice of bullying and assaulting other persons under his custody without provocation or apparent reason would tend to show that the injuries suffered by plaintiff were not the product of efforts to control him, but were inflicted intentionally and with malice. (See *Pistorius* v. *Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 556-557 [176 Cal.Rptr. 660] [evidence of prior bad faith claims incidents held admissible to negate insurance company's claim that it had no intention to commit any wrong].) The evidence also tended to disprove Ramirez's testimony that the jacket falling to the ground and plaintiff's hitting his head against the concrete floor were accidental occurrences. Therefore, four of the episodes of Ramirez's misconduct toward other suspects in his custody (the Forbes, Fish, Belbin and Palladino incidents) were relevant and admissible under section 1101, subdivision (b), to prove both intent and absence of mistake or accident during the booking. Moreover, there is no logical reason to discriminate between prior and subsequent incidents. (See *People* v. *Shoemaker* (1982) 135 Cal.App.3d 442, 447-448 [185 Cal.Rptr. 370].)

### Admissibility for Impeachment

Ramirez volunteered on direct examination that "I have developed patience working with these people that have been arrested" and that he

exercised such patience in plaintiff's case. On cross-examination, Ramirez went further and stated that he was patient "as a general rule" and that his prior statement referred to bookings that occurred both before and after the night in question. ■■■ Plaintiff contends that this testimony opened the door to admission of other misconduct incidents for impeachment purposes. We agree.

Sections 787 and 788 prohibit the use of character evidence other than honesty or veracity for the purpose of attacking the credibility of a witness. ■■ However, although " 'evidence of a specific instance of a witness' conduct is inadmissible under Evidence Code section 787 to impeach the witness as proof of a trait of his character [it] may become admissible to impeach the witness pursuant to Evidence Code section 780, subdivision (i), by proving *false* some portion of his testimony.' " (*Leader* v. *State of California* (1986) 182 Cal.App.3d 1079, 1091 [226 Cal.Rptr. 207], quoting *People* v. *Reyes* (1976) 62 Cal.App.3d 53, 62 [132 Cal.Rptr. 848].)

Thus, a witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony. (See 2 Jefferson, Cal. Evidence Benchbook, *op. cit. supra,* § 28.7, pp. 914-919.) In *Reyes, supra,* a defendant who was asked on direct whether he ever had engaged in bookmaking stated, "No. Absolutely not. I am not a bookmaker." (62 Cal.App.3d at p. 60.) The court held he was subject to impeachment by use of an otherwise inadmissible prior misdemeanor conviction for bookmaking. Similarly, in *People* v. *Cooks* (1983) 141 Cal.App.3d 224 [190 Cal.Rptr. 211], a defendant who denied that he had ever possessed a gun was allowed to be impeached with evidence of having pled guilty to a stolen gun charge. (*Id.,* at p. 324.)

■■■ The issue of Ramirez's patience in handling prisoners was raised by Ramirez himself. By portraying himself as a "patient" man who has learned to exercise restraint in "a lot" of bookings both before and after plaintiff's arrest, Ramirez left himself vulnerable to evidence tending to contradict this claim. As one court said in a criminal context: "Having chosen to extend the scope of the inquiry by a resort to superlatives, the accused must expect to be met with contrary proof. The prosecution will not be precluded from 'showing out of the defendant's own mouth that such statement is false' [citation] and with equal justice his testimony may be rebutted by witnesses who deny what he has said in his attempt to impress the sincerity of his plea by his use of extravagant language. [Citation.]" (*People* v. *Lindsey* (1949) 90 Cal.App.2d 558, 566 [203 P.2d 572].) The four incidents involving persons in custody reasonably and logically tended to disprove

Ramirez's testimony. The court therefore was incorrect in stating, "I don't think the evidence you have is . . . admissible impeachment."[3]

### Exclusion Under Section 352

Even though evidence may be relevant and admissible, the trial court is nevertheless vested with discretion to exclude it if the prejudicial effect caused by its admission outweighs its probative value. (§ 352.) The record below indicates that the judge's ruling was, at least in part, based on section 352 considerations. ▮ Specifically, the court was concerned that admission of other acts of misconduct by Officer Ramirez would result in time-consuming "mini-trials" over each incident.[4] While we appreciate the court's concern, we do not perceive it as constituting sufficient justification for keeping out all of the misconduct incidents. Ramirez's truthfulness and character for patience became the foremost issues in the case. The court's ruling effectively left Ramirez's testimony untarnished by depriving plaintiff of all available evidence to rebut it. In every case where prior similar misconduct is admitted, the defendant may be expected to bring forth a contrary version of the events. However, the fact that the jury must resolve conflicting versions cannot justify the exclusion of all such evidence on this ground alone. There were other less drastic means of controlling time consumption, such as limiting the number of witnesses who could be called.

Although the court repeatedly stated its opinion that every misconduct episode would have to be "retried," at no point did it inquire of plaintiff's attorney how many of the incidents he intended to offer or what the nature of proof would be as to each incident. Thus, if the court intended to base its exclusionary ruling upon consumption of time on collateral matters, it did not exercise its discretion in an informed manner, as section 352 requires. (Cf. 1 Jefferson, Cal. Evidence Benchbook, *op. cit. supra,* § 22.1, p. 589.)[5]

▮ ▮ In sum, the court erred in concluding that the alleged incidents were not relevant to the issues or admissible for impeachment.

---

[3] The City's contention that Ramirez could not be impeached because he did not say that he had *always* been patient with prisoners or mention specific instances of such "patience" seems to us to be splitting hairs. The officer's testimony was calculated to leave the jury with the impression of someone who exercises patience and performs his duties in a calm and straightforward manner. Clearly, the complaints revealed in his disciplinary file tend to show a picture of an entirely different individual.

[4] The court stated, "[m]y problem is you were [*sic*] going to have to retry each and every one of these incidents," and voiced the opinion that to properly admit the evidence "you have to try all of those particular episodes," because "[h]ow [else] are you going to establish that it's true?"

[5] We do not hold as a matter of law that all of the four relevant incidents must have been placed before the jury. We merely hold that, under these circumstances, it was an abuse of discretion to keep *all* of the incidents out. On retrial, the trial court is still vested with discretion to limit the evidence, depending on the offer of proof and consideration of the other guiding factors under section 352.

■ Nor could its ruling be justified as an exercise of reasonable discretion under section 352.

*Prejudice*

■ The case went to the jury as a credibility contest —they were presented with two radically different versions of plaintiff's arrest and booking. In such a situation the loss of impeachment evidence is most crucial. (Cf. *People* v. *Adams* (1988) 198 Cal.App.3d 10, 19 [243 Cal.Rptr. 580].) Had the jury been apprised of the misconduct evidence, their assessment of Ramirez's truthfulness might well have changed considerably. The court's erroneous ruling thus undermined plaintiff's entire case. We conclude that it is reasonably probable that a different result would have been reached absent the error. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

Because of this determination, we do not reach plaintiff's alternative argument that the misconduct evidence should have been admitted to prove notice to the City on his negligent employment cause of action.

### DISPOSITION

The judgment is reversed.

Kline, P. J., and Benson, J., concurred.

A petition for a rehearing was denied December 1, 1988, and the opinion was modified to read as printed above. Respondent City and County of San Francisco's petition for review by the Supreme Court was denied February 16, 1989.