Filed 11/23/20  P. v. Wakefield CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

THE PEOPLE,

     Plaintiff and Respondent,

v.

DARYL WAKEFIELD,

     Defendant and Appellant.

A158164

(Solano County
Super. Ct. No. VCR221437)

Following a jury trial, defendant Daryl Wakefield was found guilty of the murder of Erica B., the attempted first degree murder of her son Erick T., as well as related child abuse and assault charges.[1]  On appeal, defendant contends his convictions should be reversed because the trial court improperly dismissed a deliberating juror and prejudicially erred in excluding proposed impeachment evidence.  Defendant also contends the sentencing minute order should be amended to reflect the number of presentence credits ordered by the trial court at the sentencing hearing.

We conclude that the abstract of judgment must be modified to reflect 1,841 total days of custody credit and to strike the conduct credit because

_____

[1] Pursuant to California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victims and certain witnesses by their first names and last initials only.

such credit is inapplicable to a defendant convicted of murder. Accordingly, we correct the credits as set forth below and affirm the judgment in all other respects.

## I. BACKGROUND

The following is a brief summary of some of the factual and procedural background in this case, which we set out to provide context to the claims raised on appeal.

### A. *Factual Background*

Defendant was charged with the murder of Erica B. (Pen. Code,[2] § 187, subd. (a); count 1); the attempted first degree murder of Erick T. (§§ 187, subd. (a), 664; count 2); two counts of felony child abuse (§ 273a, subd. (a); counts 3–4); and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 5). Count 4 was subsequently reduced to misdemeanor child abuse. (§ 273a, subd. (a).)

Defendant met Erica B. through mutual friends in July 2014. According to an acquaintance of Erica, defendant "really liked" Erica and "[h]e made it very clear he wanted to be around her all the time."

Erica's son, Erick T., testified at trial that in the early morning on July 26, 2014, he woke up and heard defendant and Erica B. arguing in the hallway. Erica tried to leave the house but defendant blocked her path, shoved her towards the bedroom, pulled out a knife, and stabbed her approximately 20 times. When Erick entered the bedroom to help his mother, defendant kicked him, knelt on his head, and slit his neck and lip with the knife. Defendant then left on his bicycle.

---

[2] Unless otherwise indicated, all statutory references are to the Penal Code.

Erick's brother, Lorenzo T., testified that he woke up to Erick screaming and saying that their mother needed help. Lorenzo went into his mother's bedroom and saw her laying on the floor with blood everywhere around her. His mother told him to get help, and he ran to a neighbor's house where the neighbor called 911. When Lorenzo asked his brother who did this, Erick replied it was Daryl.

Vallejo Police Officer Zachary Jacobsen was one of officers who responded to the scene. He testified that a fellow officer provided first aid to Erick, as other officers were trying to figure out what injuries Erica had sustained. When the officers asked who did this to her, Jacobson heard her say it was Daryl. Solano County Deputy Sheriff Corey McLean testified that Erica died at the hospital on July 26, 2014. The director of the trauma program at Oakland Children's Hospital testified that Erick was flown to that hospital and received treatment for significant and potentially life-threatening injuries.

California Bureau of Forensic Services latent print analyst Kent Quong testified about a bloody handprint and boot prints found at the crime scene, as well as related photographs admitted into evidence. Quong opined that the bloody handprint was a match to defendant.

Vallejo Police Officer Joseph McCarthy arrested defendant on the morning of July 26, 2014. According to McCarthy, defendant had a box of cigarettes in his pocket that appeared to have a blood smear. A criminalist from the California Bureau of Forensic Services, Jonathan Sewell, concluded the blood smear on the box matched Erica's DNA profile. Sewell also determined that the source of Erica's DNA on the box was from blood, as it was highly unlikely the DNA would come from her touching the box.

Vallejo Police Sergeant Drew Ramsay was involved in the search of defendant's residence following the arrest. He testified that work boots were seized and booked into evidence. Sewell determined the insides of the boots were stained with blood and the DNA from the blood matched Erica's DNA profile. Vallejo Police Detective Mathew Mustard testified that the tread of the boots appeared to match the boot prints at the crime scene.

As the lead investigator, Detective Mustard described other aspects of the investigation. For example, he testified that he went to visit Lorenzo in foster care before family members arrived to take custody of him, and spoke to doctors and social workers regarding the medical treatment of Erick. He identified various photographs, including photographs he took of Erick's injuries and photographs of defendant's body. He additionally described certain routes and distances between Erica's and defendant's residences.

Prior to trial, defendant made a motion in limine to introduce evidence of Detective Mustard's "past misconduct" for impeachment purposes. The motion purportedly attached a California State Bar decision related to a former Solano County prosecutor,[3] which defense counsel argued included findings that Detective Mustard "pressured an expert witness to fabricate evidence to fit a theory of the case he believed happened." The motion also referred to a kidnapping case, in which defense counsel argued Detective Mustard had wrongly accused the victims of being "perpetrators of a hoax." The trial court denied the motion, concluding the evidence had "very little probative value" and would require an "undue consumption of time" to go into the facts and details of those cases.

Defendant testified at trial that he had been at Erica's house on Marin Street in Vallejo on the night of July 25, 2014, but then left to go to a nearby

---

[3] The attachment is not in the record on appeal.

4

bar, Kesler's Cocktail Lounge, before continuing to his house on Grennan Street. As he was leaving, he passed a man coming up to Erica's house. Defendant stated that after watching a video of an interview conducted by Detective Mustard, he identified that man as Erica's ex-husband Kevin B.

Contrary to defendant's testimony, Kevin B. testified that on the night of July 25, 2014, he was with his girlfriend in Cuttings Wharf, and at that time, he had not seen Erica in months, nor did he know where she lived.

## B. Jury Deliberations

At the end of the first day of deliberations, the bailiff informed the court that Juror No. 6 had approached him and asked if she could write a letter to the court in reference to the case. The bailiff recounted that when she was told no, Juror No. 6 stated "she wanted out." Juror No. 6 was then questioned by the trial court. She confirmed her "desire to be out" was not related to any medical concerns, and she could continue deliberating in the case. Juror No. 6 asked if she was allowed to say anything, and the trial court cautioned, "Not related to the deliberation in the case."

The trial court followed up about Juror No. 6's request to make a statement, explaining why the trial court and the parties wanted to be careful about not intruding into juror deliberations. When asked whether there was something preventing her or another juror from carrying out their duties, Juror No. 6 said, "[Y]es." She explained: "I don't like my hand being forced. That's it." After repeatedly confirming she was willing and able to carry out her duties, the trial court ordered Juror No. 6 to resume deliberations.

The trial court subsequently received a note from the jury stating that it was "11 and 1 on all 5 counts. The one person who votes opposite does not feel like their mind can be changed." The bailiff also informed the court that,

5

during a break, Jurors Nos. 4 and 8 approached him and asked: "[W]hat do we do if we feel like someone is not following the rules the Judge gave us." The trial court called Jurors Nos. 4, 6, and 8 in separately for questioning.

## C.  Trial Court Inquiry Regarding Juror No. 6

The trial court first questioned Juror No. 4.  According to Juror No. 4, Juror No. 6 was not following the rules given by the trial court and was no longer participating in deliberations.  Juror No. 4 explained that other jurors had been trying to explain to Juror No. 6 that certain things like testimony are "evidence" but Juror No. 6 wanted "something they can actually physically hold" or "video they can see."  Juror No. 4 stated that it was unclear whether Juror No. 6 understood that testimony could be considered evidence.  According to Juror No. 4, Juror No. 6 stated that "because of race" it was unfair for defendant to have been tried, and that "the police put the blood in his boot."  When the trial court asked whether Juror No. 6 had expressed any general views or biases about police, Juror No. 4 responded: "Something about like a brother being in prison or something" and "She just said police have been known to plant evidence."

The trial court questioned Juror No. 8 next.  Juror No. 8 said that she and Juror No. 4 had approached the bailiff but that no outside deliberations had occurred.  Juror No. 8 then explained why she thought Juror No. 6 was not following the rules: "It's like if there is evidence that has a picture that somebody referred to a picture, or a video and we don't have that video, they won't believe testimony.  So it just feels like they're not taking any of the evidence as evidence, and they want different evidence that isn't available if that makes sense."  When Juror No. 8 asked if she could provide a specific example and the trial court asked her what piece of evidence she was referring to, she said, "A hand print."  The trial court then directed Juror

6

No. 8 to discuss the issue in general, not specific, comments. Juror No. 8 explained: "If a witness was to give testimony that they studied something, analyzed something, viewed something and we don't have access to what they studied, analyzed or viewed, their word or testimony doesn't count in this juror's eyes." According to Juror No. 8, Juror No. 6 "made statements about knowing people who are incarcerated," "called out" the case as a "race thing," and had "specifically said 'it's always the black man.'"

The trial court next questioned Juror No. 6 on these topics. When asked whether she had a relative who was incarcerated at any point in time, Juror No. 6 said, "Yes." She stated her older half brother was incarcerated five or six years prior. When asked why she did not disclose this information on the jury questionnaire, Juror No. 6 said, "He's my half brother. We're not close. I don't know anything about his life." When asked whether she had brought up his incarceration in the jury room, Juror No. 6 responded, "I think I said I have friends, I know people who have been in jail. I wouldn't bring up my family."

The trial court also asked Juror No. 6 a question regarding her consideration of testimony: "If the witness says he or she reviewed something and testifying about what I may have seen on this video or piece of writing, whatever it is, do you actually require that that video or whatever the person is reviewing be brought in as well?" Juror No. 6 responded, "I'm a big believer yes, you have to show me." She then said it was not an absolute requirement before evaluating witness testimony, but "if it's a big part of what we're trying to figure out, I need to see that."

The trial court followed up: "Let's say you actually believe that witness, are you still going to need to see that piece of paper." Juror No. 6 said, "If I absolutely believe them, no. But absolutely 100 percent, which is

very rare." The court then said, "So it would have to be 100 percent absolute?" Juror No. 6 responded, "I take that back. It doesn't have to be 100 percent. I go by my feeling, my gut, go by what I feel."

### D. Dismissal of Juror No. 6 and Motion for Mistrial

After hearing argument from the parties, the trial court dismissed Juror No. 6. The trial court explained that its "primary job here is to evaluate credibility" and found "jurors 4 and 8 were credible" whereas "Juror 6 did not appear credible." It found that Juror No. 6's "comment about why she did not disclose her brother on her form does not appear credible" and that "[t]here may be bias there with regards to police." The trial court concluded that Juror No. 6 "did not answer this question truthfully about the relative being involved in the criminal justice system."

As to her consideration of testimony, the trial court explained that Juror No. 6 first said she would only credit testimony without the actual evidence if she was "a hundred percent absolute" on believing a witness, but then "recognized where I was going and walked it back. Then said no, I just have to know it in my gut." The trial court concluded that "it appears she's not following the law, this whole idea about not accepting testimony absent the actual piece of evidence."

After Juror No. 6's dismissal, defendant moved for a mistrial. Defense counsel argued: "I think that the way that the Court tried to handle it was appropriate at the time, but I think how it was handled, at this point the deliberative process of the jury was interfered with." The trial court denied the motion.

Juror No. 6 was replaced with Alternate Juror A. The parties subsequently agreed, however, to excuse Alternate Juror A for cause based on his failure to disclose prior police contacts and concerns regarding his

8

previously unseen tattoos.[4]  The trial court replaced Alternate Juror A with Alternate Juror B.

## E.  Verdict

After Alternate Juror B was sworn in, the jury began deliberations anew.  The jury found defendant guilty as charged.  It found true the allegations that the murder of Erica B. was in the first degree, and that defendant had personally inflicted great bodily injury upon Erick T. with a stabbing instrument during the commission of attempted first degree murder, felony child abuse, and assault.

## F.  Motion for New Trial

Defendant moved for a new trial on July 29, 2019.  He initially argued the trial court improperly dismissed Juror No. 6 without sufficient basis and noted Jurors Nos. 4 and 8 had engaged in outside deliberations by approaching the bailiff.  The trial court rejected the argument, deferring to the record made during its inquiry regarding juror No. 6 and finding "no evidence to suggest that there was improper discussion of any facts or deliberations by Jurors 4 and 8 alone."

Next, defendant argued the evidence regarding Detective Mustard's prior misconduct should have been admitted.  The trial court again referred to the record on its evidentiary ruling, but also explained:  "[I]t looked like Detective Mustard testified on visiting Lorenzo at the foster care, and he spoke with the medical doctor and social worker and looked at photographs— and reviewed the photographs of Erick [T.].  He talked about the distance between the Kesslars Bar [*sic*] and the Grennon [*sic*] Street residence.  He

---

[4] Defendant renewed his motion for mistrial based on the dismissal of Alternate Juror A.  In his opening brief, however, defendant confirms that the trial court's denial of this renewed motion is not at issue in this appeal.

9

talked about some photos of Mr. Wakefield . . . . He did discuss findings within the home such as blood trails and that sort of evidence in the home. [¶] I would note all of that was otherwise photographed as well." The trial court concluded: "So in any event, even if I did err in excluding Detective Mustard's testimony—which I don't think I did—I don't find that his testimony was a key piece of evidence that would be prejudicial. [¶] I think the key evidence in this case was the photos in the house which obviously mostly speak for themselves. The blood on the shoes of the defendant. The blood on the cigarettes. Those were found by the officer with respect to the DNA testimony and linked to the DNA testimony." The trial court denied the motion.

### G. Sentence

The trial court sentenced defendant to 79 years to life in prison plus 180 days in county jail. At the sentencing hearing, the trial court ordered the following presentencing credits: 1,751 days of actual time credit and 262 days of conduct credit for count 2, plus 90 days of actual time credit and 90 days of conduct credit for count 4.

## II. DISCUSSION

On appeal, defendant contends that his conviction should be reversed for two reasons. First, he claims the trial court improperly dismissed Juror No. 6 during deliberations, absent sufficient evidence of her misconduct or refusal to deliberate and in violation of defendant's constitutional rights. Second, he claims the trial court prejudicially erred by excluding proposed impeachment evidence regarding Detective Mustard's prior conduct.

In the alternative to his arguments for reversal of the conviction, defendant maintains the trial court should correct its sentencing minute

order to reflect the presentencing custody credit it awarded defendant at the sentencing hearing.  We address each argument in turn.

## A.  *Dismissal of Juror During Deliberations*

Defendant contends the trial court erred in dismissing Juror No. 6 during deliberations without sufficient evidence she committed misconduct or refused to deliberate.  Specifically, defendant contends the record lacks evidence Juror No. 6 intentionally withheld information during jury selection, was biased against the police, or refused to follow the court's instructions.  Defendant also argues that, by removing the sole holdout juror from the jury, the trial court's dismissal of Juror No. 6 violated his constitutional rights to due process and a fair trial.

### 1.  *Standard of Review*

Under section 1089, the trial court has authority to discharge a juror " '[i]f at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty.' "  (See *People v. Cleveland* (2001) 25 Cal.4th 466, 474 (*Cleveland*).)  " 'We review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve.' "  (*People v. Williams* (2001) 25 Cal.4th 441, 448 (*Williams*).)

While we review the trial court's exercise of its authority to discharge a juror for abuse of discretion, our review involves a " 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' "  (*People v. Armstrong* (2016) 1 Cal.5th 432, 450.) "Specifically, the juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.' "  (*Ibid*.)  The demonstrable reality test

" 'entails a more comprehensive and less deferential review' " than the substantial evidence test, as it " 'requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established.' " (*Id.* at pp. 450–451.) While we do not reweigh the evidence, we " 'must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' " (*Id.* at p. 451.) We " 'consider not just the evidence itself, but also the record of reasons the court provides.' " (*Ibid.*)

### 2. *Juror Misconduct*

Here, the trial court provided two reasons for its decision to discharge Juror No. 6: (1) she had not truthfully answered the question about incarceration of a relative on her jury questionnaire that may reflect some police bias; and (2) she failed to follow the law by not accepting testimony absent the actual piece of evidence.

### a. False Statement in Jury Questionnaire

False statements in a jury questionnaire can be grounds for dismissal of a deliberating juror where such statements may conceal a disqualifying bias. (*People v. Lomax* (2010) 49 Cal.4th 530, 590 [concluding no error on dismissal of sitting juror with finding of false questionnaire answer that he had no conscientious objection to death penalty].) When the evidence bearing on the question of whether a juror has exhibited a disqualifying bias during deliberations is in conflict, the trial court "must weigh the credibility of those whose testimony it receives, taking into account the nuances attendant upon live testimony." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.) A reviewing court "afford[s] deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal." (*Ibid.*)

12

Here, juror No. 6's answer to the trial court on whether she had a relative who had been incarcerated flatly contradicted her answer on the jury questionnaire. When confronted by the contradiction, Juror No. 6 explained that she had not included her half brother's incarceration on the questionnaire because they were not close. She also denied having discussed his incarceration during deliberations. The trial court found Juror No. 6's explanation was not credible, and that "[t]here may be bias there with regards to police." The trial court found Jurors Nos. 4 and 8 to be credible, having reported that Juror No. 6 made comments during deliberations about her brother and other people she knew being incarcerated. On this record, we conclude that the trial court's finding that Juror No. 6 made a false statement in her jury questionnaire reflecting possible bias was supported by sufficient evidence on which the trial court specifically relied.

### b. Failure to Follow Court Instructions

"A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of Penal Code section 1089." (*Williams*, *supra*, 25 Cal.4th at p. 448.) Accordingly, a deliberating juror may be dismissed by the trial court on this basis. (*Ibid.*)

Here, the jury was instructed that "evidence" is "the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence" and that "[t]he testimony of only one witness can prove any fact." It was instructed that "[i]n evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." The jury was also instructed that neither side was required "to produce all physical evidence that might be relevant." During the trial court's inquiry, however, Juror No. 6 stated that she would only credit witness testimony without the actual evidence if she believed a

13

witness "absolutely 100 percent," which she said was "very rare." When asked whether she required the physical evidence that related to witness testimony, she responded, "I'm a big believer yes, you have to show me." These statements were consistent with the reports from Jurors Nos. 4 and 8 that Juror No. 6 was unwilling to consider testimony as evidence without the actual physical evidence. While Juror No. 6 attempted to take back her statement, the trial court found it not credible as Juror No. 6 "recognized where I was going and walked it back." Again, on this record, we conclude that the trial court's finding that Juror No. 6 was not following the law regarding witness testimony was supported by sufficient evidence on which the trial court specifically relied.

### c. Trial Court's Inquiry

Beyond his challenges to the trial court's reasoning, defendant contends there were several "problems" with the trial court's inquiry regarding Juror No. 6. Specifically, defendant asserts there was jury misconduct through the juror note regarding their 11-1 vote and outside deliberations by Jurors Nos. 4 and 8, and the testimony by Jurors Nos. 4 and 8 "revealed" disagreement about a handprint and the blood found in the work boot improperly delved into the content of deliberations.

Trial courts are presented with a difficult task when confronted with alleged juror misconduct. "Determining whether to discharge a juror because of the juror's conduct during deliberations is a delicate matter, especially when the alleged misconduct consists of statements made during deliberations." (*Cleveland, supra,* 25 Cal.4th at p. 484.) "The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*Id.* at p. 485.) Questioning of jurors by the parties is

14

generally not permissible, and the inquiry should be as limited in scope as possible. (*Ibid.*)

We conclude that the trial court's inquiry did not run afoul of these principles and procedures. As a preliminary matter, the trial court ordered Juror No. 6 back to deliberations after she made a statement to the bailiff that she "wanted out" but then confirmed she was able and willing to continue. It was only after receiving the jury note and the bailiff's report on the question from Jurors Nos. 4 and 8 that the trial court determined further inquiry was warranted. The trial court then led its own separate questioning of Jurors Nos. 4, 6, and 8. The record reflects that the trial court repeatedly cautioned the three jurors to avoid responses that would divulge the substance of their deliberations, and intervened when their answers threatened to go too far afield. Importantly, the trial court questioned Juror No. 8 regarding whether any outside deliberations had taken place, and Juror No. 8 confirmed they had not.

In sum, we conclude that the trial court did not abuse its discretion in discharging Juror No. 6. Because we have concluded the trial court did not abuse its discretion, the discharge of Juror No. 6 did not violate defendant's constitutional rights. (*People v. Wilson* (2008) 44 Cal.4th 758, 820–821 ["The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, ' "does not offend constitutional proscriptions." ' "].) For the same reasons, we similarly conclude that the trial court did not abuse its discretion in denying defendant's motions for mistrial and new trial based on the discharge of Juror No. 6.

## B. *Exclusion of Proposed Impeachment Evidence*

Defendant argues next that the trial court prejudicially erred by excluding proposed impeachment evidence regarding Detective Mustard's

15

prior conduct. Specifically, defendant claims he was entitled to present evidence concerning Detective Mustard's involvement in two unrelated criminal cases: (1) a case that subsequently resulted in the discipline of a prosecutor, where the State Bar Court purportedly made findings that Detective Mustard pressured an expert witness; and (2) a case where Detective Mustard had purportedly accused a couple of being "perpetrators of a hoax" before the evidence proved they were indeed victims of the alleged crimes.[5] Defendant maintains the evidence was relevant to Detective Mustard's credibility and to the issue of whether Detective Mustard sufficiently considered Kevin B. as a suspect.

The trial court "has broad discretion under Evidence Code section 352 'to exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the

---

[5] Defendant filed a separate request for judicial notice with his opening brief. We deferred ruling on the request until the merits of the appeal. (See *People v. Preslie* (1977) 70 Cal.App.3d 486, 493–494.) Having now considered the request, we deny it in full. Defendant asks us to take judicial notice of two documents: (1) an amended decision in a California State Bar Court matter and (2) a civil complaint filed in the Eastern District of California. Defendant admits that the complaint was never presented to the trial court. Defendant suggests, without any evidence, that the amended decision may have been attached to his motion in limine. "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) In exceptional circumstances, an appellate court can, but is not required to, take judicial notice of material that was not presented to the trial court in the first instance. (*Ibid.*; see *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325.) As defendant has not established that either document was presented to the trial court and has not shown any exceptional circumstances here, we follow the general rule and decline to exercise our discretion to take judicial notice of these documents.

jury." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 60; *People v. Gurule* (2002) 28 Cal.4th 557, 619 [explaining trial courts have broad discretion " 'to admit or exclude evidence offered for impeachment on a collateral matter' "].) We review the trial court's ruling to exclude proposed impeachment evidence for abuse of discretion. (*Merriman*, at p. 74.) We will not disturb the trial court's exercise of its discretion under Evidence Code section 352 "unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman*, at p. 74.)

Defendant cites *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938 (*Andrews*) to support his position that the trial court erred by excluding the proposed impeachment evidence. In *Andrews*, the plaintiff sued the city and several police officers alleging, in part, that he was assaulted by an officer during the booking process. (*Id.* at pp. 940–941.) The plaintiff claimed the officer had jumped on top of him and repeatedly bashed his head on the floor. (*Id.* at p. 945.) The officer, however, testified that he was patient and polite but was forced to wrestle the plaintiff to the ground after the plaintiff swung at him. (*Ibid.*) The trial court granted a motion to exclude evidence of six other incidents of misconduct by the officer, including incidents where the officer had allegedly assaulted individuals after their arrest and during booking. (*Id.* at pp. 942–943.) *Andrews* concluded that the trial court had abused its discretion under Evidence Code section 352 because the case "went to the jury as a credibility contest" and thus the officer's "truthfulness and character for patience became the foremost issues in the case." (*Andrews*, at pp. 948, 947.)

That is not this case. Here, we agree with the trial court that the proposed impeachment evidence had minimal probative value that was

17

substantially outweighed by the undue consumption of time for presentation of evidence from two unrelated criminal cases.  Unlike *Andrews*, Detective Mustard's credibility was not a central issue in this case and the alleged misconduct purportedly shown by the proposed evidence was not particular to defendant's challenge that Detective Mustard failed to sufficiently consider another suspect.  We conclude that the trial court did not err in excluding the proposed impeachment evidence.

Moreover, even assuming that the exclusion was erroneous, any such error was harmless.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  The evidence of defendant's guilt in this case was overwhelming:  the blood on defendant's work boots and cigarette box matched Erica B.'s DNA profile, the bloody handprint at the scene was a match to defendant, and witness testimony that both Erica B. and Erick T. had contemporaneously identified defendant as their assailant.  Evidence regarding Detective Mustard's conduct in other unrelated criminal cases "would have had ' "very little effect on the issues" ' " and thus was not so prejudicial as to result in a manifest miscarriage of justice.  (*Merriman*, *supra*, 60 Cal.4th at p. 75.)

In sum, we conclude that the trial court did not abuse its discretion in excluding the proposed impeachment evidence regarding Detective Mustard's prior conduct.  For the same reasons, we similarly conclude that the trial court did not abuse its discretion in denying defendant's motion for a new trial based on this exclusion of evidence.

## C.  *Presentence Custody and Conduct Credits*

Finally, defendant requests that the trial court correct its sentencing minute order to accurately reflect the number of days for presentence custody and conduct credits ordered at the sentencing hearing.  The Attorney General does not contest the argument as to the *custody* credits, but instead asserts

that defendant's *conduct* credits should be stricken because conduct credits are inapplicable to a person convicted of murder.

At the sentencing hearing, the trial court ordered 1,751 days of actual time credit and 262 days of local conduct credit for count 2, plus 90 days of actual time credit and 90 days' local conduct credit for count 4. The trial court explained that there were zero credits for count 1 as a consecutive term, and the same credits for count 2 applied to counts 3 and 5 as concurrent terms. The abstract of judgment reflects 1,751 total days of actual time credit and 262 total days of local conduct credit.

While defendant raises this issue for the first time on appeal, "[t]he failure to award an adequate amount of credits is a jurisdictional error which may be raised at any time." (*People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8.; *People v. Cardenas* (2015) 239 Cal.App.4th 220, 235 [" 'A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered.' "].)

As to the custody credits, we agree with defendant that the abstract of judgment should be modified to reflect a total of 1,841 days of custody credit. The record is consistent with the trial court's calculation at the sentencing hearing that defendant had accrued 1,841 days of presentence time served (1,751 days plus 90 days of actual time credit for count 4).

As to the conduct credits, defendant contends the sentencing minute order fails to reflect the trial court's oral pronouncement of 180 days of presentence custody credits for count 4. However, we agree with the Attorney General that the abstract of judgment should be modified to strike any days of conduct credit. Section 2933.2 provides, in relevant part: "(a) Notwithstanding Section 2933.1 or any other law, any person who is convicted of murder, as defined in Section 187, shall not accrue any credit, as

19

specified in Section 2933 or Section 2933.05" and "(c) Notwithstanding Section 4019 or any other provision of law, no credit pursuant to Section 4019 may be earned against a period of confinement in, or commitment to, a county jail . . . following arrest for any person specified in subdivision (a)." The plain language of section 2933.2 clearly prohibits the application of presentence conduct credits to a defendant convicted of murder. (*People v. Chism* (2014) 58 Cal.4th 1266, 1336 ["Subdivision (a) of section 2933.2 prohibits any person convicted of murder from accruing any presentence conduct or worktime credit."]; *In re Carr* (1998) 65 Cal.App.4th 1525, 1532, fn. 2 ["Section 2933.2, subdivision (c) is clear—no murderer, even one receiving an extremely unlikely grant of probation, would ever be entitled to presentence conduct credits."].) Such language "reflects an intent to supersede any and all provisions of law that might support an award of presentence conduct credits." (*People v. McNamee* (2002) 96 Cal.App.4th 66, 70.)

The Attorney General acknowledges that there was no objection made to the conduct credit when ordered and there has been no appeal of this error. "While it might be preferable to bring such an error first to the attention of the trial court, because such an error appears to be in the nature of an unauthorized sentence, it may be corrected whenever it is brought to the attention of a court." (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1193 [ordering amended abstract of judgment with reduced days of local conduct credit and rejecting argument that the modification should not be made because the People had not appealed the error].)

In sum, we conclude that the abstract of judgment must be corrected to increase defendant's presentence custody credit to a total of 1,841 days, and

to strike defendant's presentence conduct credit as required by section 2933.2.

## III. DISPOSITION

The judgment is modified to reflect 1,841 days of credit for actual time served and to strike any days of local conduct credit. The trial court is directed to prepare an amended abstract of judgment that reflects the above modification and to transmit a copy of the amended abstract to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

MARGULIES, ACTING P. J.

WE CONCUR:


BANKE, J.


SANCHEZ, J.


A158164
*People v. Wakefield*

22