Filed 11/1/22  P. v. Gooding CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093376 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F07708) |
| v. | |
| JAMAAL DARRIS GOODING, | |
| Defendant and Appellant. | |

A jury found defendant Jamaal Darris Gooding guilty of premeditated attempted murder and assault with a firearm.  As to the attempted murder conviction, the jury found true that defendant personally used and intentionally discharged a firearm causing great bodily injury.  As to the assault with a firearm conviction, the jury found true that defendant personally used a firearm and inflicted great bodily injury.  The trial court sentenced defendant to 32 years to life for the attempted murder conviction and associated enhancement and stayed, pursuant to Penal Code[1] section 654, a 17-year sentence for the assault with a firearm conviction and associated enhancements.

---

[1]      Further section references are to the Penal Code unless indicated otherwise.

On appeal, defendant contends the evidence was insufficient to demonstrate he harbored an intent to kill or that the attempted murder was premeditated and deliberate. He further contends he was provided inadequate notice that he could be convicted of a premeditated and deliberate attempted murder, rendering the indeterminate sentence he received for the attempted murder conviction unauthorized. Defendant also raises several evidentiary and sentencing claims of error.

We affirm defendant's convictions but agree his case must be remanded for resentencing. Upon remand, the trial court shall sentence defendant under all newly-enacted provisions applicable to him.

FACTUAL AND PROCEDURAL BACKGROUND

At approximately 10:30 p.m., on Halloween 2015,[2] defendant was involved in a verbal altercation with a man at a McDonald's restaurant that ended with defendant shooting the man in the chest and upper thigh. The victim's lung was punctured, but his injuries were not life threatening. The entire encounter was visually recorded on surveillance footage and shown to the jury at defendant's trial.

The video depicted defendant walking into McDonald's with his two cousins. On their way into the restaurant, defendant and his cousins were encountered by the victim. The victim and defendant's group exchanged words before defendant and his cousins went inside McDonald's and the victim stayed outside. Over three minutes later, the victim went inside McDonald's and reengaged with defendant and his cousins. The men appeared to be talking back and forth, and defendant looked angry while talking to the victim. The victim then walked out of McDonald's. Defendant and his cousins left the dining area of the restaurant and went to the bathroom. They returned to the dining area approximately 30 seconds later. The victim was at the entrance of the restaurant when

_____

[2] All date references are to the year 2015 unless indicated otherwise.

defendant and his cousins returned to the dining area. The victim remained there for several seconds before going to his car, which was parked right outside the entrance of the restaurant.

A little over a minute after leaving the bathroom, defendant pulled the hood of his sweater over his head and put his left hand in his sweater pocket. The victim came into the entryway of the restaurant and spoke to defendant for several seconds before going back outside. During that time, defendant can be seen waving off the victim, nodding, and at one point laughing. A woman affiliated with the victim left McDonald's and defendant followed her to the door. Defendant and the victim shook hands and talked in the entryway of the restaurant for approximately 30 seconds. Defendant then pulled a gun out of his pocket and fired at the victim three times.

Upon a search of defendant's phone, officers found several text messages and Internet searches relevant to defendant's state of mind in the days after the shooting. In the late evening hours of November 1, defendant searched the phrase "California attempted murder law" twice on the Internet. On November 5 and 6, defendant searched the Internet for a McDonald's shooting occurring in Sacramento. On November 10, defendant searched again for "California attempted murder law" and "McDonald's shooting in Sacramento." (Italics omitted.)

Defendant was interviewed by police on November 10. During that interview defendant denied he was at McDonald's during the shooting. After the interview, on November 11, defendant again searched the Internet for information related to a shooting at McDonald's. Later that day, defendant searched the term "[m]anslaughter" and the phrases "[c]an lawyers help attempted murder cases" and "[a]ttempted murder charges and penalties." (Italics omitted.) He also searched the phrase "Will I still go to jail if my homicide case involved self-defense," before visiting a website entitled "Find local criminal defense lawyers." (Italics omitted.) The next day, defendant searched "McDonald's shooting in Sacramento." (Italics omitted.)

3

Following the shooting, defendant sent and then deleted the following text message: "Ima call you tmrw. We gon talk, bro. Be smooth. [My cousin] told you [I] shot a hoe nigga on Halloween. Click. LOL." (Italics omitted.) Defendant also sent and then deleted the following message: "We got into it a[t] McDonald's and I shot somebody." He was also involved in a chat messaging conversation in which he said, "Nah fam the reason I'm hot and I said that Kuz I shot somebody on Halloween smh." The person he was communicating with responded, "Well damn. Its gon be straight tho fam." Defendant responded, "Thanks [prayer emoji] I'm used to it. Ima hit you lil later thoe. And see Wsp."

The victim testified at trial. He said he was drunk the night of the shooting and did not recall much about the interaction between himself and defendant. He testified he did not threaten defendant. Two percipient witnesses testified at trial. Neither of the witnesses recalled the specific words exchanged between defendant and the victim. One witness recalled both parties instigating the confrontation and the victim saying to defendant "you're gonna remember me, the guy from McDonald's. He's a real OG." The witness also recalled the interaction escalating more than was appropriate for the situation.

Defendant testified at trial. He said he was 21 years old at the time of the shooting. He testified he arrived at McDonald's knowing one of his cousins was armed with defendant's gun. When the victim encountered defendant and his cousins outside McDonald's, the victim made disparaging remarks about defendant's cousin who was not armed. Defendant and his cousins told the victim he was not funny and to not play around. The victim responded without humor, " 'I don't play around either.' " Defendant took the victim's statement as a threat that the victim could hurt them.

Defendant testified that, after the victim's statement, he saw his armed cousin pull out the gun. In response, defendant told his cousin to put the gun away. Defendant's armed cousin and the victim exchanged words, and then defendant and his cousins went

4

inside McDonald's to order food. The victim stayed outside until defendant and his cousins were done ordering and were waiting for their food. The victim then came inside McDonald's and reengaged with defendant's armed cousin. Defendant told the victim multiple times to leave them alone, but the victim continued to talk to them. The victim said, " 'By the time you guys are done ordering you guys' food, you guys are going to see what I'm about.' " A woman affiliated with the victim, who was inside McDonald's ordering food, apologized for the victim's behavior. Defendant's armed cousin said he was " 'done' " and defendant told his cousin to meet defendant in the bathroom.

Defendant and his armed cousin met in the bathroom where defendant took possession of the gun and defendant gave his previously armed cousin the keys to the car. Defendant put the gun in his pocket. Defendant returned to the dining area of McDonald's and saw that the victim had gone to his car. Defendant believed the victim was retrieving a gun. The victim returned to the door of the McDonald's and yelled for defendant and his cousins to come outside. Defendant took the victim's demand as a threat that if defendant went outside, he was going to get hurt.

Defendant waved off the victim in an attempt to tell him to leave him and his cousins alone. The victim did not leave defendant alone and kept saying, " 'Come outside, come outside. What's up.' " Based on the victim's tone, defendant took the victim's words as a threat to inflict violence. Defendant continued to wave off the victim and tell him to leave him and his cousins alone.

Defendant eventually went outside to tell the victim that he and his cousins did not want any problems. The victim did not back down and continued to stand near the door of the McDonald's despite the woman he was with leaving McDonald's with food. The victim held his hand out to defendant in an apparent attempt to resolve the problem. Defendant shook the victim's hand, but the victim would not let go of defendant and pulled defendant toward him. The victim then said to defendant, " 'I'm an OG in this shit and I don't play around so don't think I would ever play around with you mother

5

fuckers.' " Defendant knew the term "OG" to mean original gangster and described an "OG" as a person who has experience being violent. Defendant took the comment as a threat and was scared the victim was going to hurt him.

The victim eventually let go of defendant's hand but continued to make threats. The victim said, " 'You guys want smoke? You guys can come see me.' " Defendant walked back into McDonald's to get away from the victim. The victim then said, " 'Do not turn around. That's how mother fuckers get killed.' " Defendant took the comment as a threat that the victim would immediately hurt him. Defendant also thought the victim "could have had a gun, knife, anything," especially because the victim said the word kill.

Defendant turned around and, in response, the victim said, " 'You're gonna remember me, the guy from McDonald's. I'm a real OG.' " Defendant also took this statement as a threat, making him scared he was going to get hurt. Defendant did not see a gun. Because the victim threatened to kill defendant and defendant could not see both of the victim's hands, defendant shot the victim.

After shooting the victim, defendant ran home, disposing of the gun along the way. Defendant testified he owned the gun for a year and one-half before the shooting. He owned a gun because he did not feel safe without one. Defendant testified he did not devise a plan to kill the victim while in McDonald's and he did not intend to kill the victim when he shot at him. Defendant claimed to have shot the victim because the victim threatened to kill defendant.

When defendant returned home, he went straight to his bedroom without talking to his mother. He testified he did not tell his mother what happened because he did not want to disappoint her or tell her that he had possessed a gun in her home. Defendant testified he was sad, depressed, and did not act like his normal happy self for several days after the shooting.

6

On cross-examination, the prosecutor asked defendant about several photos and videos found on defendant's cell phone. The first video was a rap video that depicted defendant rapping and included multiple references to "gangland," drugs, and guns, and included images of a real gun.[3] For example, one line in the song said, "How we click . . . when he ain't even pop shit. That wheel dope smoke the chopsticks." (Italics omitted.) Defendant testified he interpreted the lyric as meaning: "How are you part of the crew if you ain't never shot a gun." Another line from the song said "hit him with that slapstick. 40 or 30 K. [He] lean down like a mattress." (Italics omitted.) To defendant this line meant to shoot a person who then falls to the ground. Another line said, "Let that block spin." (Italics omitted.) To defendant, this meant to shoot guns.

When asked about his multiple references to the word "gangland," defendant testified "gangland" was a word people said a lot in his neighborhood. He also testified his references to "flashing like lightening" was to shooting guns and "big timing" was to making money. The prosecutor asked defendant to explain the lyric: "Trying to knock a little sucker bitch, little sucker bitch." Defendant testified he was rapping about talking to girls but explained he would never use this language in an actual conversation with a woman, and that the lyric was just music. Defendant further made hand gestures in the recording resembling the shape of a gun. He explained he made the gestures because they were consistent with the theme of the song. Throughout his testimony, defendant maintained the song was not how he actually thought about guns but was just a song incorporating themes from his neighborhood.

Also on defendant's phone was a video of himself driving behind a police car. In the video defendant can be heard saying, "In the hood right now. You see the police, man. You feel me? I'm trying to hide my phone though, man. You feel me? You know

---

[3]     The rap video was not made part of the appellate record. Our description of the video is limited to the video's transcript and defendant's testimony describing it.

me.  I'm out here though man.  You feel me.  Look at these suckas, though man!"
Another video depicted defendant rapping in freestyle before firing a gun.  The freestyle
lyrics he recorded were:  "Young Mizzle.  Knocking niggas down with the stencil.  You
already even know I shot 'em with a 4-4."

The prosecutor also questioned defendant about several photos depicting guns
discovered on his cell phone.  One photo showed a gun on defendant's lap.  Defendant
testified the gun was fake.  Another photo showed the gun used in this case, while a third
photo showed defendant holding the gun used in this case and the fake gun depicted in
the first photo.

Following the close of evidence, the jury found defendant guilty of premeditated
attempted murder and assault with a firearm.  As to the attempted murder conviction, the
jury found true that defendant personally used and intentionally discharged a firearm
causing great bodily injury.  As to the assault with a firearm conviction, the jury found
true that defendant personally used a firearm and inflicted great bodily injury.  The trial
court sentenced defendant to 32 years to life for the attempted murder and associated
enhancement and stayed, pursuant to section 654, a 17-year sentence for the assault with
a firearm and associated enhancements.

Defendant appeals.

DISCUSSION

I

*Sufficiency Of The Evidence*

Defendant raises two contentions related to the sufficiency of the evidence
presented at trial.  First, he contends the evidence was insufficient to demonstrate he
acted with the intent to kill.  Second, he contends the evidence was insufficient to
demonstrate he acted with premeditation and deliberation.  We disagree with both
contentions.

In determining whether sufficient evidence supports a conviction, " 'we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We do not reweigh evidence. (*Ibid*.) This standard also applies to insufficient evidence claims involving circumstantial evidence. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) " 'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." ' " (*Ibid*.) The effect of this standard of review is that a defendant challenging the sufficiency of the evidence to support a conviction bears a heavy burden on appeal. (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.)

A

*Sufficient Evidence Demonstrated Defendant Acted With The Intent To Kill*

Attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Although implied malice is sufficient for murder, express malice is required to prove attempted murder. (*People v. Stone* (2009) 46 Cal.4th 131, 139-140.) "Malice is *express* when the killer harbors a deliberate intent to unlawfully take away a human life." (*People v. Lasko* (2000) 23 Cal.4th 101, 104.) The mental state required to convict a defendant of attempted murder may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

9

The surveillance footage showed defendant seeking out the victim once the woman affiliated with the victim picked up the food she had ordered and left the restaurant. Defendant followed her to the door and encountered the victim. The victim shook defendant's hand and the two men spoke for several seconds. The victim turned to leave and defendant, standing within a few feet of the victim, shot three rounds at the victim's midsection. Firing multiple rounds at such a vulnerable area of the body is sufficient to uphold an intent to kill finding. (See, e.g., *People v. Smith*, *supra*, 37 Cal.4th at p. 741 [firing toward victim at close range in way that could have inflicted mortal wound may support inference of intent to kill]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 ["firing a shot at a vital area of the body at close range" is "indicative of a deliberate intent to kill"].)

Defendant disagrees, arguing his age and the low-caliber weapon he used support a finding he lacked intent to kill. While this evidence is relevant, it is not dispositive. (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11 ["[m]atters of . . . the weight of the evidence are ' " 'the exclusive province' " ' of the trier of fact"].) The surveillance footage showed defendant clearly targeting the victim's attention and intentionally firing a gun three times at close range at vulnerable areas of the victim's body. Defendant's age and use of a low-caliber gun do not undermine the reasonable inference of intent drawn from the other evidence. Accordingly, sufficient evidence supports the jury's intent-to-kill finding.

B

*Sufficient Evidence Demonstrated Defendant Acted With Premeditation And Deliberation*

An attempted murder is deliberate and premeditated "if it occurs ' " 'as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " ' " (*People v. Cardenas*, *supra*, 53 Cal.App.5th at p. 121; see *People v. Jurado* (2006) 38 Cal.4th 72, 118.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz,*

10

*supra*, 27 Cal.4th at p. 1080.) " ' "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 276.)

We ordinarily consider " 'three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported -- preexisting motive, planning activity, and manner of killing -- but "[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation." ' " (*People v. Cardenas*, *supra*, 53 Cal.App.5th at p. 121; see *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Those guidelines -- referred to as the *Anderson* factors -- "are descriptive and neither normative nor exhaustive," so "reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

The jury could reasonably infer from the evidence that defendant had a preexisting intent to kill the victim because the victim had disparaged defendant's cousin and would not leave defendant and his cousins alone. The jury could also reasonably infer defendant engaged in planning activity when defendant and his cousin went to the bathroom shortly before the shooting and defendant gained possession of the gun. Finally, as to the manner of killing, defendant fired three rounds at close range at vulnerable areas of the victim's body before immediately fleeing the scene. These facts support the finding defendant premeditated and deliberated killing the victim. (See, e.g., *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 ["quickly fir[ing] three shots at the victim, with a shotgun, from a relatively close range" supported finding of premeditation and deliberation]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1002 [deliberately aiming at people the defendant had a motive to kill supported a finding of premeditation and deliberation].)

11

## II

*Defendant's Indeterminate Sentence On*

*His Attempted Murder Conviction Is Not Unauthorized*

Defendant contends his indeterminate sentence was unauthorized because the prosecution failed to plead in the information that the attempted murder was committed with premeditation and deliberation. Defendant acknowledges his counsel did not object on this ground in the trial court, but argues his claim is preserved under established case law. We disagree. Defendant had adequate notice the prosecution was seeking an enhanced sentence on his attempted murder charge, and thus his failure to object to the prosecution's failure to include a premeditation allegation in the information forfeited the issue.

### A

*Background*

Defendant was charged by an amended information alleging, among other things, that defendant committed attempted murder pursuant to sections 187, subdivision (a) and 664 "in that said defendant did unlawfully, and with malice aforethought attempt to murder [the victim], a human being." The prosecution's motions in limine did not reference a premeditation allegation associated with the attempted murder charge. Defendant's trial brief and motions in limine also did not reference a premeditation allegation associated with the attempted murder charge.

During motions in limine and a discussion of the admissibility of the plethora of gun photos discovered on defendant's phone, the trial court commented that premeditation was a key issue in the case. The parties also agreed to discuss jury instructions between themselves but foresaw minimal issues outside the applicability of the self-defense instruction. When it came time to address the jury instructions, neither defendant nor his counsel voiced surprise at or objected to the instructions planned to be submitted to the jury. The same is true for the proposed verdict forms, which the parties

acknowledged included a spot for a premeditation and deliberation finding. When the instructions were submitted to the jury, they included the pattern jury instruction on premeditation and deliberation (CALCRIM No. 601), and the verdict forms included a spot for the jury to find a premeditation and deliberation allegation true or not true.

During closing argument, the prosecutor argued the evidence showed defendant premeditated and deliberated the attempted murder because he acted without impulse, concealed his identity, touched the gun several times before pulling it out of his pocket, pulled back the hammer of the gun, shot three times at vulnerable areas of the victim's body, and fled the scene. In response, defendant's counsel argued defendant did not act with premeditation and deliberation but acted in self-defense.

The prosecution filed a sentencing brief advocating for the maximum sentence without reference to the premeditation finding. Defense counsel filed a sentencing brief advocating for the minimum sentence and acknowledged the court was required to impose an indeterminate sentence for the attempted murder conviction. At sentencing, the trial court imposed an indeterminate sentence for the attempted murder conviction based on the premeditation and deliberation finding without objection from defense counsel.

B

*Defendant Forfeited His Notice Contention*

Section 664, subdivision (a), provides: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. . . . The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (See generally *People v. Houston* (2012) 54 Cal.4th 1186, 1226-1228 [considering a claim pursuant to § 664,

13

subd. (a)].) Section 960 provides: "No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."

The parties rely on three cases for their respective and adverse positions: *People v. Houston*, *supra*, 54 Cal.4th at page 1186, *People v. Arias* (2010) 182 Cal.App.4th 1009, and *People v. Perez* (2017) 18 Cal.App.5th 598. We discuss these cases in chronological order.

In *Arias*, "the charging document alleged defendant unlawfully and with malice aforethought attempted to murder [two people], but did not allege the attempted murders were willful, deliberate, and premeditated. Nor did [those counts] reference subdivision (a) of section 664. No request was made to amend the information to include the required allegations, and nothing in the record suggest[ed] the information was ever amended. Nevertheless, the trial court instructed that if the jury found defendant guilty of attempted murder, it [had to] make a separate determination of whether the prosecution proved the attempted murder was done willfully and with premeditation and deliberation. The jury's attempted murder verdicts did not include special findings as to premeditation and deliberation, but found 'first degree attempted murder' as to both victims. At sentencing, the trial court imposed the section 664, subdivision (a) punishment of life in prison for the attempted murder convictions." (*People v. Arias*, *supra*, 182 Cal.App.4th at p. 1017, fn. omitted.) The People argued the defendant forfeited his claim by failing to challenge the adequacy of the pleading in the trial court. (*Ibid*.) The appellate court disagreed.

The *Arias* court relied on our Supreme Court's decision in *People v. Mancebo* (2002) 27 Cal.4th 735. (*People v. Arias*, *supra*, 182 Cal.App.4th at p. 1017.) "In *Mancebo*, [our Supreme Court] found no waiver, despite the defendant's failure to object at the time of sentencing, because the imposition of a sentencing enhancement based on

14

an unpled enhancement allegation in violation of statutory pleading requirements amounted to an unauthorized sentence." (*Arias*, at p. 1017.) The *Arias* court concluded the violation of section 664, subdivision (a)'s pleading requirement "was no mere formal defect in the information. Rather, defendant was not given notice of the special sentencing enhancement that would be used to increase his punishment from a maximum of nine years to a life term." (*Arias*, at p. 1020.) "In short, the prosecution has not complied with the notice requirements imposed by section 664, the defendant had no actual notice of his risk of an enhanced sentence, the life terms were stricken, and the case was remanded for resentencing." (*People v. Perez, supra*, 18 Cal.App.5th at p. 616.)

Like *Arias*, in *Houston*, the indictment did not allege that the attempted murders were deliberate and premeditated. (*People v. Houston, supra*, 54 Cal.4th at p. 1226.) During trial, the court presented the parties with a draft of the verdict forms, which required the jurors to determine whether the attempted murders were willful, deliberate, and premeditated. (*Ibid*.) The court sought to clarify this issue, stating its understanding that the prosecution intended to charge premeditated attempted murder -- " 'the type of attempted murder [that is] punished by life imprisonment rather than five, seven, nine.' " (*Ibid*.) The court explicitly told the parties to notify the court if this was not correct. (*Ibid*.) A week later, the trial court announced its intent to have the verdict form set forth deliberate and premeditated attempted murder as a special finding. (*Ibid*.) At the close of evidence, the court instructed the jury on the definition of attempted murder, and directed the jury to determine whether the attempted murders were willful, deliberate, and premeditated. (*Ibid*.) The jury found that they were. (*Ibid*.) Defendant did not object before the court submitted the case to the jury or at sentencing. (*Ibid*.)

On these facts, our Supreme Court found the defendant "received adequate notice of the sentence he faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated. A timely objection to the adequacy of the indictment would have provided an opportunity to craft an appropriate remedy. Because

15

defendant had notice of the sentence he faced and did not raise an objection in the trial court, he ha[d] forfeited this claim on appeal." (*People v. Houston*, *supra*, 54 Cal.4th at p. 1228.) In reaching its decision, the court declined to decide whether *Arias* "erred in ruling that the defendant there did not forfeit his claim that the indictment was inadequate." (*Houston*, at p. 1229.)

Our Supreme Court declined to consider the propriety of *Arias* because it was "unclear when the trial court issued its proposed jury instructions and verdict forms to the parties and whether this issue was discussed." (*People v. Houston*, *supra*, 54 Cal.4th at p. 1229.) The court instead distinguished *Arias*: "In contrast, the trial court here actually notified defendant of the possible sentence he faced before his case was submitted to the jury, and defendant had sufficient opportunity to object to the indictment and request additional time to formulate a defense. In addition, the jury was properly instructed and made an express finding that the attempted murders were willful, deliberate, and premeditated. On these facts, we conclude that defendant forfeited his claim that the indictment did not comply with section 664." (*Houston*, at p. 1229.)

In *Perez*, like in *Arias* and in *Houston*, the prosecution failed to allege premeditated attempted murder. (*People v. Perez*, *supra*, 18 Cal.App.5th at p. 614.) Like *Houston*, but unlike *Arias*, the *Perez* jury "found that each of the attempted murders was willful, deliberate, and premeditated." (*Perez*, at p. 606.) The question before us was "whether the mere mention of the possibility of an enhanced sentence for premeditated attempted murder during the court's discussion of unrelated jury instructions impart[ed] the notice required by due process as described in [*Houston*] or whether . . . the rationale of [*Arias* was appropriate] in holding the sentence was unauthorized in light of the prosecution's failure to satisfy the express statutory requirement coupled with the failure to advise defendant of the potential enhanced penalty." (*Perez*, at p. 614.) We found the latter answer more appropriate.

16

We explained that, based on what we gleaned from the *Houston* decision, in the absence of the notice required under section 664, it is important that the potential life sentence penalty be discussed with the defendant at trial. (*People v. Perez*, *supra*, 18 Cal.App.5th at pp. 617-618.) "While the Supreme Court was willing to forgive the prosecutor's transgression in *Houston*, it was precisely because the trial court had provided what the prosecutor had failed to do; that is, the court was satisfied the defendant was accorded fair notice of the charges he faced and an adequate opportunity to object to or tailor his defense." (*Perez*, at p. 618.)

We found that, "[u]nlike the trial court in *Houston*, which clearly telegraphed the issue for the defendant, the prosecutor's brief allusion to the attempted murder counts when discussing an unrelated jury instruction did not give defendant fair notice that his sentence could jump from a maximum of nine years to a life term for each of the four counts." (*People v. Perez*, *supra*, 18 Cal.App.5th at p. 618.) To find otherwise would have meant "the prosecution can ignore its responsibility to plead premeditated attempted first degree murder as required by section 664, and a defendant forfeits his or her right to challenge the deficiency as long as the prosecutor at some point during trial mentions or alludes to the two types of attempted murder. Such a rule would eviscerate section 664, do violence to the meaning and rational of *Houston*, and undermine any fairminded understanding of notice and due process." (*Perez*, at p. 617.)

Here, the record reflects defendant was on notice the attempted murder charge included an allegation he committed the act with premeditation and deliberation, and thus the charge carried an indeterminate term. Before trial, the trial court referred to the premeditation issue and the parties indicated they would talk about the jury instructions. After the introduction of evidence, the parties went over the jury instructions again, and defendant made no objections to the pattern jury instruction pertaining to premeditation and deliberation, even though the court gave the parties additional time to review and object to the proposed instructions. When discussing verdict forms, the parties explicitly

17

approved of including the premeditation and deliberation finding in the jury's attempted murder verdict. The court again gave the parties time to review the forms and make further objection if warranted. Both parties addressed the issue during closing argument, and defense counsel addressed the issue in her sentencing brief. At bottom, defendant's case is like *Houston* because "defendant was accorded fair notice of the charges he faced and an adequate opportunity to object to or tailor his defense." (*People v. Perez, supra*, 18 Cal.App.5th at p. 618.) On this record, there was more than an allusion to the two types of attempted murder; indeed, the issue was at the center of defendant's trial as noted by the trial court before a single witness was called. Accordingly, defendant forfeited his notice contention, and his indeterminate attempted murder sentence was not unauthorized.

## III

### *Evidentiary Claims*

Defendant challenges the admission of several pieces of evidence, which can be divided into two categories -- evidence that was admitted as part of the prosecution's case-in-chief and evidence that was admitted as impeachment evidence. We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.)

## A

### *It Was Not An Abuse Of Discretion To*
### *Admit Defendant's Text Messages And Internet Searches*

Defendant first challenges the trial court's admission of his text message that read: "Ima call you tmrw. We gon talk, bro. Be smooth. [My cousin] told you [I] shot a hoe nigga on Halloween. Click. LOL." (Italics omitted.) He argues this text message did not constitute an admission and was hearsay because it is unclear whether these are defendant's words or a recitation of his cousin's words. Concerns about ambiguity of a statement, however, pertain to the evidence's weight not admissibility. (*People v. Young*

18

(2019) 7 Cal.5th 905, 927; *People v. Ochoa* (2001) 26 Cal.4th 398, 438.)  It is enough that a reasonable juror could understand the evidence as the prosecution argued it when making an evidentiary ruling.  (*Young*, at p. 927.)  As defendant concedes, it is unclear who to attribute these words to -- defendant or his cousin.  But one reasonable inference is that the words can be attributed to defendant, and thus there was a sufficient basis for the trial court to find this message was a statement by a party opponent and admissible.

Defendant further challenges, on relevancy grounds, the admission of his remaining text messages and all of his Internet searches.  Under Evidence Code sections 350 and 351, respectively, "[n]o evidence is admissible except relevant evidence," and "all relevant evidence is admissible."  Under Evidence Code section 210, " "Relevant evidence' " means "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

Defendant argues his text messages "[w]e got into it a[t] McDonald's and I shot somebody" and "Nah fam the reason I'm hot and I said that Kuz I shot somebody on Halloween smh" were irrelevant because the identity of the shooter was not a fact in dispute.  Pointing to the lack of context shown by the messages, defendant argues the fact he did not assert self-defense in the text messages does not provide probative value to the messages because it is unclear defendant's relationship with the recipients was such that he would explain "the nuances of the shooting."  Again, defendant's argument goes to weight, not admissibility.  As explained, it is enough that a reasonable juror could understand the evidence as the prosecution argued.  (*People v. Young*, *supra*, 7 Cal.5th at p. 927.)  Defendant knew the people he was communicating with well enough to implicate himself in a crime, yet he did not explain to them facts that excused his criminal conduct.  It is reasonable to infer from these messages and defendant's failure to assert self-defense that defendant knew he did not have a valid claim of self-defense.

19

Defendant argues all of his Internet searches were irrelevant. As described, in the days following the shooting, defendant searched the phrase "California attempted murder law" multiple times, the term "manslaughter," the phrases "[c]an lawyers help attempted murder cases," and "[a]ttempted murder charges and penalties." (Italics omitted.) It was not until after he was interviewed by police that defendant searched the phrase, "Will I still go to jail if my homicide case involved self-defense" and visited a Web site entitled "Find local criminal defense lawyers." (Italics omitted.) Defendant further searched the Internet multiple times before and after his interview with police for information pertaining to a shooting at McDonald's. The trial court admitted this evidence because there was probative value in the timing and number of searches pertaining to the shooting and the lack of searches pertaining to defendant's claim of self-defense. To the trial court, defendant's searches were relevant to his state of mind and claim of self-defense.

This was not an abuse of discretion. Indeed, these Internet searches demonstrate that defendant's state of mind was focused on getting away with a crime in the days following the murder. His Internet searches pertained to whether there was public knowledge of the shooting and the extent of his culpability for the shooting. It was not until he was interviewed by police that defendant switched his focus to defending against criminal charges and claiming self-defense. The relevance of these Internet searches cannot be judged on a search-by-search basis, but in the overall timing, volume, and progression of the terms and phrases being searched. It is that progression that demonstrated defendant's changing state of mind and provided context to whether his claim of self-defense was credible.

We agree with defendant that a criminal suspect's Internet searches pertaining to hiring an attorney are not relevant to prove guilt. That was not, however, the purpose for which defendant's Internet searches was admitted and defendant has not pointed to any allusion to such an inference in the record. Indeed, the prosecutor's closing argument focused on the progression of defendant's Internet searches as relevant to whether his

20

claim of self-defense was credible. Thus, to the extent defendant argues evidence of his Internet searches was unduly prejudicial because the jury would improperly infer defendant's guilt, that claim lacks merit.

For the same reasons, we reject defendant's due process claim pertaining to his text messages and Internet searches. (*People v. Lucas* (1995) 12 Cal.4th 415, 464 [proper admission of evidence under state rules of evidence generally does not violate a defendant's due process rights].)

B

*The Trial Court Erred By Admitting Defendant's*
*Rap Video Into Evidence; However, The Error Was Harmless*

Defendant argues the trial court abused its discretion by admitting photographs of him possessing guns, a video of him freestyle rapping and shooting a gun, a video of him driving behind a police car appearing to make light of the shooting, and his rap video because these items of evidence did not constitute proper impeachment. We disagree; however, we do agree with defendant that his rap video should have been excluded on Evidence Code section 352 grounds.

When a defendant testifies in his or her own defense, that defendant places his or her own credibility in issue and is subject to impeachment. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139; Evid. Code, § 1101, subd. (c) ["Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness"].) Further, under Evidence Code section 780, subdivision (i), "a witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony." (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946.) The admission of impeachment evidence is subject to the trial court's exercise of discretion under Evidence Code section 352. (*People v. Clark* (2011) 52 Cal.4th 856, 931.) Evidence Code section 352 provides: "The court in its discretion may exclude

21

evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The trial court admitted the challenged evidence because it demonstrated defendant's relationship with guns and his emotional reaction to the shooting. Defendant testified he owned a gun because he did not feel safe without it. He also testified he did not want his mother to know he possessed a gun in her home because it would disappoint her. This testimony left the impression with the jury that defendant owned a gun for self-defense and was modest about his gun ownership by keeping his ownership secret from his family. The challenged evidence impeaches this testimony. The photographs of defendant with guns, the freestyle rap video wherein defendant fires a gun into a neighborhood, and the rap video wherein defendant displays a gun and raps about shooting people all refute the impression he owned a gun because he did not feel safe without one. Indeed, the evidence demonstrated defendant's gun ownership was not a defensive nor a modest act. Similarly, the video of defendant driving behind a police car and making light of the shooting refuted defendant's testimony he was depressed for several days after the shooting and did not leave his bedroom or act like his usual happy self. This evidence was all relevant to the credibility of defendant's testimony.

Defendant disagrees that the challenged evidence constituted impeachment evidence. First, he argues his testimony on direct examination was admissible evidence, thus could not have been cured by inadmissible evidence. Not so. The challenged evidence was ruled inadmissible before defendant testified because it was irrelevant. Once defendant testified to his own character as a gun owner and his mental state in the days after the shooting, the evidence became relevant and admissible. The challenged evidence was related to the issues raised by defendant's testimony and served to refute the impression defendant had left with the jury concerning his relationship with guns and his emotional reaction to the shooting.

22

Second, defendant argues the challenged evidence did not serve to refute his testimony because it is possible to own a gun for self-defense and also exhibit bravado in that ownership. He further argues his making light of the shooting did not refute that he was also depressed following the shooting. The standard for admitting impeachment evidence, however, is not that the evidence disprove any given fact, but that it "has any tendency in reason to prove or disprove the truthfulness of [defendant's] testimony . . . ." (Evid. Code, § 780.) The challenged evidence tended to disprove defendant's testimony, and thus it met the threshold for admission.

Finally, defendant argues the evidence constituted inadmissible character evidence because the jury could use the evidence to determine defendant was more likely to use a gun offensively. Not so. The evidence was admitted to attack defendant's credibility and refute the testimony he supplied during direct questioning by his attorney, which left the impression that defendant would use a gun only in self-defense.

Even so, the admission of defendant's rap video carried unduly prejudicial weight, leading us to conclude it should have been excluded.[4] The rap video's relevance was limited given its artistic purpose and the fact it did not pertain to this or any other actual shooting. To the extent the rap video impeached defendant's assertions he owned a gun for self-defense and was modest with his gun ownership, those assertions were rebutted with the photographs of defendant with guns and the freestyle rap video clip. The extended rap video, especially the lyrics of the song, added little to the jury's consideration. Further, the rap video introduced the topics of gangs and drugs into a case where those topics were not at issue. On balance, defendant's rap video was unduly prejudicial when weighed against its limited probative value.

---

**4** In his opening brief, defendant does not raise Evidence Code section 352 contentions to the other items of challenged evidence but addresses prejudice in the context of harmless error review only.

Regardless, admission of the rap video was harmless under either standard. (*People v. Watson* (1956) 46 Cal.2d 818; *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].) The entire interaction between defendant and his victim was recorded on surveillance footage. The jury was able to judge defendant's demeanor as well as the victim's demeanor, and at no point did the victim look threatening nor defendant look scared. Further, the video showed defendant and his cousins went into the bathroom a short time before defendant came out of the bathroom with a concealed gun. Defendant then sought out the victim, engaged in a conversation in close proximity to the victim, and then shot the victim several times. A reasonable inference from this video and defendant's testimony that he took possession of the gun in the bathroom is that defendant and his cousins hatched a plan in the bathroom to shoot the victim. Accordingly, defendant was not harmed by the admission of his rap video.

IV

*Remand Is Appropriate*

Defendant contends his case must be remanded for the trial court to resentence him in light of several recent changes in the law. (Citing Assem. Bills Nos. 124 (2021-2022 Reg. Sess.) & 518 (2021-2022 Reg. Sess.); Sen. Bill No. 567 (2021-2022 Reg. Sess.).) The People acknowledge the recent changes cited by defendant are applicable to him and that he falls within the laws' ameliorative language. The People argue, however, that remand is futile because the trial court will undoubtedly make the same sentencing decision it has already made. We are not persuaded.

In the context of Assembly Bill No. 518's amendment to section 654, there is no clear indication what sentencing decision the trial court would have made if it had possessed the sentencing discretion given by Assembly Bill No. 518. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [when sentencing decisions are made without informed discretion, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion

24

'even if it had been aware that it had such discretion' "].) Assembly Bill No. 518, which became effective on January 1, 2022, expands the trial court's discretion. Under section 654, a defendant who violates multiple laws in a single course of action may be charged with and convicted of distinct crimes but sentenced for only one offense; sentence on the other offenses is imposed but stayed. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673.) Former section 654 required the trial court to impose sentence based on the offense with the longest prison term. (*Sek*, at p. 673.) Assembly Bill No. 518 amended section 654 to "remove[] the requirement to impose the longest prison term" (*Sek*, at p. 673) in order "to give trial courts discretion in selecting the punished offense for conduct punishable under multiple provisions of law" (*People v. Mendoza* (2022) 74 Cal.App.5th 843, 861-862). Section 654, subdivision (a) now provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

The trial court acknowledged the Legislature required an "extreme sentence" in defendant's case and declined to strike or reduce the gun enhancement attached to defendant's attempted murder conviction because defendant's firing of the gun fell squarely within the definition of section 12022.53, subdivision (d). The trial court further imposed the aggravated term for defendant's stayed assault with a deadly weapon conviction based on defendant causing injury to the victim he assaulted. While the trial court's stated reasons provide some basis for its sentencing decisions, these reasons do not convince us the trial court would have chosen the 32-years-to-life sentence flowing from the attempted murder conviction and attached gun enhancement mandated by former section 654 over the 17-year sentence flowing from the assault with a deadly weapon conviction and attached gun and great bodily injury enhancements allowed by current section 654. Stated differently, while the trial court may have believed the upper terms were appropriate for counts one and two, there is nothing in the record indicating it

preferred the sentence imposed by count one over the sentence imposed by count two. Thus, remand is required. Upon remand, the trial court shall fully resentence defendant, incorporating all new legislative changes. (See *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.)

## DISPOSITION

Defendant's convictions are affirmed. Defendant's sentence is vacated, and the matter is remanded for a full resentencing.

/s/_____
Robie, Acting P. J.

We concur:

/s/_____
Hoch, J.

/s/_____
Boulware Eurie, J.